812 A.2d 389 (2002)
356 N.J. Super. 266
STATE of New Jersey, Plaintiff-Respondent,
v.
Lloyd FULLER, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted September 25, 2002.
Decided December 31, 2002.
*390 Peter A. Garcia, Acting Public Defender, attorney for appellant (William Welaj, Designated Counsel, of counsel and on the brief).
Peter C. Harvey, Acting Attorney General, attorney for respondent (Richard W. Berg, Assistant Attorney General, of counsel and on the brief).
Before Judges WEFING, LISA and FUENTES.
The opinion of the court was delivered by LISA, J.A.D.
Tried to a jury, defendant was convicted in Essex County of first-degree armed robbery, N.J.S.A. 2C:15-1, and fourth-degree *391 possession of an imitation firearm under circumstances that would lead an observer to believe it was possessed for unlawful purposes, N.J.S.A. 2C:39-4e. The weapons offense was merged with the robbery. Defendant was sentenced to ten years imprisonment. After the trial, and while pending sentencing, defendant pled guilty to another Essex County indictment for third-degree receiving stolen property, N.J.S.A. 2C:20-7, and second-degree eluding the police, N.J.S.A. 2C:29-2b, pursuant to a plea agreement recommending sentences of four years imprisonment for each offense, concurrent to each other but consecutive to sentence imposed on the earlier indictment. Defendant was sentenced on both indictments on the same date. The judge followed the recommendation in the plea agreement (which included sentencing the second-degree eluding as though it were a third-degree offense, pursuant to N.J.S.A. 2C:44-1f(2)). Defendant's aggregate sentence was fourteen years. Appropriate monetary sanctions were also imposed.
On appeal, defendant contends:
POINT I
THE TRIAL COURT ERRED IN DENYING DEFENSE COUNSEL'S MOTION FOR A NEW TRIAL SINCE THE PROSECUTOR EXERCISED HIS PEREMPTORY CHALLENGES ON CONSTITUTIONALLY-IMPERMISSIBLE GROUNDS, THEREBY DENYING TO THE DEFENDANT HIS RIGHT TO EQUAL PROTECTION AS WELL AS A FAIR TRIAL.
POINT II
THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE.
We reject these contentions and affirm.
Because the issues raised on appeal are limited to the jury selection procedures and the sentence, we need not recount the facts in detail. The robbery occurred when defendant entered a take-out restaurant, pointed a gun at the proprietor, and demanded money. The proprietor, believing it was a real gun, became frightened and went to the cash register to comply with defendant's demand. Upon further observation, however, the proprietor realized it was a water gun, and he wrested it from defendant. He then called the police. Defendant testified he was only playing a practical joke on the proprietor, a contention the jury obviously did not believe. Although not real, the gun meets the definition of a "deadly weapon" for purposes of robbery, pursuant to N.J.S.A. 2C:11-1c.
In this robbery trial, the prosecutor was entitled to exercise twelve peremptory challenges and defendant was entitled to twenty. N.J.S.A. 2B:23-13b; R. 1:8-3(d). The prosecutor exercised six; the defense exercised five. Defendant is African-American. Five of the six peremptory challenges exercised by the prosecutor were directed at African-American jurors. Defense counsel objected on two occasions during the jury selection process, and again raised the issue in a new trial motion prior to sentencing. Defendant argues the prosecutor violated his right to equal protection of the laws and to a trial by a jury drawn from a representative cross-section of the community by using peremptory challenges to exclude five African-American jurors.
Our Supreme Court has held "that Article I, paragraphs 5, 9, and 10 of the New Jersey Constitution forbid a prosecutor to exercise peremptory challenges to remove potential petit jurors who are members of a cognizable group on the basis of their presumed group bias; the State, however, may peremptorily challenge such venirepersons on grounds of situation-specific bias." State v. Gilmore, 103 N.J. 508, 517, 511 A.2d 1150 (1986). Without question, members of the black race constitute a *392 cognizable group for these purposes. Id. at 526-27 n. 3, 511 A.2d 1150.
In State v. Clark, 316 N.J.Super. 462, 720 A.2d 632 (App.Div.1998), Judge Skillman cogently summarized the three-step procedure in which a trial court must engage in evaluating a prosecutor's challenged use of peremptory challenges:
[D]efendant initially has the burden to make a "prima facie showing that the prosecution exercised its peremptory challenges on constitutionally-impermissible grounds." To satisfy this burden, a defendant "must establish that the potential jurors wholly or disportionately excluded were members of a cognizable group within the meaning of the representative cross-section rule" and that "there is a substantial likelihood that the peremptory challenges resulting in the exclusion were based on assumptions about group bias rather than any indication of situation-specific bias." If a defendant makes this prima facie showing, "[t]he burden shifts to the prosecution to come forward with evidence that the peremptory challenges under review are justifiable on the basis of concerns about situation-specific bias." To satisfy its burden, "the State must articulate `clear and reasonably specific' explanations of its `legitimate reasons' for exercising each of the peremptory challenges." Finally, if the State presents such reasons, "the trial court must judge the defendant's prima facie case against the prosecution's rebuttal to determine whether the defendant has carried the ultimate burden of proving, by a preponderance of the evidence, that the prosecution exercised its peremptory challenges on constitutionally-impermissible grounds of presumed group bias."
[Id. at 468-69, 720 A.2d 632 (quoting State v. Gilmore, 103 N.J. 508, 535-37, 539, 511 A.2d 1150 (1986)) (citations omitted).]
Defense counsel first interposed an objection after the prosecutor exercised his fifth peremptory challenge, the last four of which were against African-American individuals. When the objection was made, the prosecutor, without waiting for a ruling by the court whether defendant met his initial burden, volunteered the reasons for excusing each of the four African-American jurors. The court then ruled on the ultimate issue. Thus whether a prima facie showing was made by defendant became moot. Our task is to evaluate the ultimate determination by the trial judge that the prosecutor's reasons precluded defendant from establishing, by a preponderance of the evidence, that the challenges were exercised on constitutionally-impermissible grounds of presumed group bias.
The first juror peremptorily challenged was C.E., a white man. He had been working as a missionary for the past two years and his wife was also a missionary. The next three, all African-American, had friends or relatives who had been convicted of crimes. A.C.'s brother was convicted of stealing a vehicle about two years earlier; S.A. had friends who were convicted of selling drugs; and B.L.-C.'s nephew had pled guilty to killing a man about twenty years earlier, but she had not had regular contact with him since he moved to Georgia about seven or eight years earlier after serving his time. Notably, A.C. had "cousins and a couple friends that are police officer[s]," and S.A. had "two relatives on the police force."
The prosecutor exercised his fifth peremptory challenge on M.S., an African-American man, whose aunt worked for the Newark Police Department and whose brother was shot to death in 1995. M.S. was dressed entirely in black clothing (described *393 in the post-trial motion as a "rather long outer garment") and wore a skull cap.
Upon defense objection, the prosecutor, at side bar, stated his reasons for exercising these challenges:
Well, to make sure we are very clear about this, Judge, the first juror who was excused was [C.E.], who was a missionary and white.... The next three who were black all had members of their family or friends who were convicted of crimes.
And the last juror was excused was also black, [M.S.], is Muslim. And I have found with regard to juror number one [and] juror number four that people who tend to be demonstrative about their religions tend to favor defendants to a greater extent than do persons who are, shall we say, not as religious. So that those are the reasons for my excusals of the jurors at this point.
The judge found those reasons sufficient and denied defendant any relief.
The prosecutor later exercised a peremptory challenge against S.G., an African-American, whose cousin had been charged, tried and acquitted of rape about three years earlier in Essex County. S.G. testified as a witness for his cousin in a trial conducted in a courtroom "down the hall." Defense counsel objected to the prosecutor's challenge and renewed her motion to declare a mistrial and vacate the jury panel. At side bar, the prosecutor stated his reasons for excusing S.G. After recounting S.G.'s experience in testifying for his cousin, he stated:
So, he may very well say it wouldn't affect him; I don't have to accept that. I wonder how he will be judging someone who might be close to his cousin's age on a case right down the hall from where his own cousin had been acquitted of a very serious crime, and whether he could, in fact, be fair and impartial. Especially considering the fact that it was this office that apparently prosecuted him.
The judge found this reason to be sufficient and again denied defendant's motion.
In Gilmore, the Court determined the New Jersey Constitution guarantees "that in all criminal prosecutions the defendant is entitled to trial by an impartial jury without discrimination on the basis of religious principles, race, color, ancestry, national origin, or sex." State v. Gilmore, supra, 103 N.J. at 524, 511 A.2d 1150. Defendant asserts a violation of this guarantee based on race with respect to the five African-American jurors peremptorily excused by the prosecutor, and also based on religious principles with respect to M.S.
We first address the race issue. As previously noted, members of the black race clearly constitute a cognizable group. To be permissible, a prosecutor's peremptory challenge of a member of a cognizable group must be "`on grounds that are reasonably relevant to the particular case on trial or its parties or witnessesi.e., for reasons of specific bias....'" State v. Gilmore, supra, 103 N.J. at 538, 511 A.2d 1150 (quoting People v. Wheeler, 22 Cal.3d 258, 148 Cal.Rptr. 890, 906, 583 P.2d 748, 765 (1978)). The prosecutor must "show a genuine and reasonable ground for believing that a prospective juror might have an individual or personal bias that would make excusing him or her rational and desirable." State v. McDougald, 120 N.J. 523, 555, 577 A.2d 419 (1990).
Importantly, a party reasonably may believe on any number of grounds "that a prospective juror may have some slight bias that would not support a challenge for cause but that would make excusing him or her desirable." State v. Gilmore, supra, 103 N.J. at 538, 511 A.2d *394 1150 (quoting McCray v. Abrams, 750 F.2d 1113, 1132 (2nd Cir.1984)). Defendant places reliance on the fact that each challenged juror stated he or she could be fair and impartial. A.C., S.A. and B.L.-C., who had friends or relatives who had been convicted of crimes, stated that circumstance would not affect their ability to be impartial. S.G. likewise stated his experience in testifying in his cousin's criminal trial would not affect his impartiality. These assertions may properly preclude challenge for cause. The circumstances and experiences, however, that are specific to these individual jurors, may reasonably lead the prosecutor to believe the jurors may harbor some "slight bias" against the State in the criminal trial for which a jury is being selected. "There is nothing ineffable or inscrutable about sound `hunches.' " State v. Gilmore, supra, 103 N.J. at 538, 511 A.2d 1150.
The reasons expressed by the prosecutor for excusing A.C., S.A., B.L.-C. and S.G. are race-neutral, individualized to their particular circumstances or experiences, sufficiently specific, and reasonably relevant to the case on trial. We find nothing unreasonable or irrational in a prosecutor's belief that individuals with these life experiences might disfavor the State in a criminal prosecution. Further, there is nothing to suggest the prosecutor's peremptory challenges against these jurors were not exercised in an even-handed manner. Although not argued at trial, on appeal defendant points to two other jurors who the prosecutor did not challenge who, according to defendant, are similarly situated to those challenged. We have reviewed the record and observe that the experiences of one individual involved disorderly persons offenses, not crimes, and one of them was very remote in time. The other juror's nephew had been involved in "something to do with killing a teacher in Newark" in the 1970's or 80's.
The juror had no contact with his nephew since then and he was unclear about the nature of the offense. Thus the offense was remote in time and his relationship with the offender was attenuated. Very significantly, the record does not reveal the race of these two jurors. One or both of them may have been African-American. The final jury composition included five African-American jurors. These two individuals were on the jury finally selected. We are satisfied there is no need for a remand for an attempted determination of the race of these two jurors, an explanation by the prosecutor of his reason for passing on them while excusing the others, and supplemental findings by the trial court. The record supports a reasonable basis for distinction as argued by the State on appeal.
The final composition of the jury is not dispositive of whether the prosecutor's intent in exercising peremptory challenges against members of a cognizable group was discriminatory. However, the entire selection process is relevant to that determination, and the final composition, the product of that process, is highly probative of the prosecutor's intent. State v. Clark, supra, 316 N.J.Super. at 474, 720 A.2d 632. That five African-American jurors were among those finally selected is thus corroborative of the prosecutor's asserted genuine and reasonable race-neutral reasons. The prosecutor approved of the jury while holding six unused peremptory challenges, and the defense approved while holding fifteen unused peremptory challenges.
Finally, we consider that we must accord substantial deference to the trial court's sense of fairness and findings relating to whether the prosecutor exercised his peremptory challenges on constitutionally impermissible grounds. State v. Gilmore, supra, 103 N.J. at 545, 511 A.2d *395 1150; State v. Clark, 324 N.J.Super. 558, 571, 737 A.2d 172 (App.Div.1999).
Against these standards, we find no error in the trial judge's determination that defendant failed to carry his burden of proving the prosecutor's reasons for excusing A.C., S.A., B.L.-C. and S.G. were pretextual and based on group bias. In other words, defendant did not establish that these individuals were excluded because they are African-American.
We next consider prospective juror M.S. The prosecutor inferred from M.S.'s name[1] and attire that he was a Muslim and that he was devout in his faith. The prosecutor pointed out that he excused C.E., who is white, a missionary of unknown affiliation, as well. He explained he excused both of these individuals for the same reason, namely because of his belief "that people who tend to be demonstrative about their religions tend to favor defendants to a greater extent than do persons who are, shall we say, not as religious."
At the new trial motion, the prosecutor elaborated on his reasons for excusing these two jurors:
White juror I dismissed, I believe, was a minister, if memory serves me correctly, or was a missionaryI tend to forget; but had some sort of religious affiliation. And the other juror was, apparently, Muslim, I would say, based upon his dress and the name, if I'm not mistaken. But I did not dismiss any juror because of religious beliefs.
I think what I said was it's been my experience that persons who strongly profess to religious belief or religious persuasion might be more lenient towardmight be more forgiving toward a defendant, and might not listen to the evidence as perhaps they should. They may very well tend to be more accepting of a person's professions of innocence in the face of facts to the contrary. And that's why I exercised those challenges.
....
So, therefore, Judge, Gilmore really does not apply here. Gilmore is really applicable when there is an obvious attempt to exclude jurors of a particular race, a particular religious group. That is not what we had here. So, I really say that [defense counsel's] allegations or accusations really come to naught, in light of the final composition of the jury.
I don't even think [defense counsel] can say with utmost honesty what the ultimate religious composition of the jury was. I certainly can't. I don't think the Court can either.
....
And I believe I commented [at] the time that, you know, it was obvious he [M.S.] was apparently very devout in his faith, and that's what led me to believe that he might be sympathetic toward the defendant; despite facts that might go to the contrary.
And the man who was the minister indicated to us that that was his profession, that's how we happened to know. So, there were other obvious manifestations and that's something that we drew conclusions to.
We reject defendant's argument that M.S. was impermissibly challenged under the Gilmore holding. Fundamentally, the Gilmore rationale and holding require the identification of a cognizable group, which may then be the target of group bias in the jury selection process. "The peremptory challenge, exercised in an absolutely unfettered manner, could be abused to strike all members of certain *396 cognizable groups from the jury venire, and so could destroy the representative cross-section rule." State v. Gilmore, supra, 103 N.J. at 530, 511 A.2d 1150 (emphasis added). In prescribing the three-step process for mounting a challenge to the exercise of peremptory challenges, the Court stated "the defendant initially must establish that the potential jurors wholly or disportionately excluded were members of a cognizable group within the meaning of the representative cross-section rule." Id. at 535-36, 511 A.2d 1150 (emphasis added). The Court cited with approval the statement in McCray v. Abrams, supra, 750 F.2d at 1132, that defendant's showing must demonstrate "a substantial likelihood that the challenges leading to the exclusion have been made on the basis of the individual venireperson's group affiliation rather than because of any indication of a possible inability to decide the case on the basis of the evidence presented." Id. at 1131 (emphasis added). The forbidden use of peremptory challenges lies in the exclusion of jurors, presuming them to be biased "merely because they are members of an identifiable group distinguished on racial, religious, ethnic or similar grounds...." Id. at 531, 511 A.2d 1150 (quoting People v. Wheeler, supra, 148 Cal.Rptr. at 902, 583 P.2d at 761 (emphasis added)).
We have held that age-defined groups are not cognizable for purposes of impartial jury analysis. State v. Bellamy, 260 N.J.Super. 449, 457, 616 A.2d 1323 (App. Div.1992). We determined that "young people" do not constitute a cognizable group within the meaning of Gilmore, noting that "[t]o prove either an equal protection or fair cross-section claim, a defendant must first identify a constitutionally cognizable group, i.e., a group capable of being singled out for discriminatory treatment." Id. at 453, 616 A.2d 1323 (quoting State v. Ramseur, 106 N.J. 123, 215, 524 A.2d 188 (1987)).
In Bellamy, we considered the rationales of courts in other jurisdictions which have rejected age as a basis for establishing a cognizable group. The parameters of such a "group" are difficult to ascertain, rendering any attempt to classify jurors as "young adults," "middle age adults," and so on an essentially arbitrary process. State v. Bellamy, supra, 260 N.J.Super. at 454, 616 A.2d 1323. Further, there has been no showing that members of such a "group" hold cohesive and consistent values and attitudes or that their values and attitudes are substantially different from other segments of the community. In this regard, it is also significant that young adults are not a group that has traditionally needed special legal protection. Id. at 454-55, 616 A.2d 1323. Finally, membership in such a group is in flux. Id. at 454, 616 A.2d 1323.
We recognize that Article I, Paragraph 5 of the New Jersey Constitution, which underpins Gilmore, does not contain a prohibition of discrimination based on age, whereas it does prohibit discrimination based on "religious principles," as well as "race, color, ancestry or national origin." Defendant contends M.S. was improperly excluded based on religious principles. We do not agree.
We first note that in Gilmore, the Court found the constitutional proscription against discrimination based on "religious principles" congruent with the then-statutory proscription of N.J.S.A. 2A:72-7[2] prohibiting discrimination in jury selection based on "creed." State v. Gilmore, supra, 103 N.J. at 526, 511 A.2d 1150. The Gilmore Court disapproved as a clear indication of religious group bias the prosecutor's exclusion of African-American jurors *397 because he assumed they were predominantly Baptists.[3]Id. at 541, 489 A.2d 1175. Baptists constitute a clearly defined group, a creed or denomination sharing common religious principles. Thus exclusion based upon membership in this group is properly prohibited.
The exclusion of M.S., however, was not based on his presumed membership in the Muslim faith. If it were, the exclusion would be constitutionally impermissible. The prosecutor believed, from the manner of M.S.'s dress, that he was likely to be "very devout in his faith." The prosecutor further believed that people who tend to be demonstrative about their religions tend to be defense-oriented.
The prosecutor asserted he "did not dismiss any juror because of religious beliefs." If this assertion is sustainable on the record, the exercise of these peremptory challenges, although having to do with religion in a general sense, does not offend the constitutional prohibition against discrimination based on religious principles or creed. The prosecutor's assertion is bolstered by his earlier challenge of C.E., the white missionary of unknown religious affiliation.
In evaluating whether a prosecutor's intent is discriminatory, a court should not consider the prosecutor's action respecting each juror in a vacuum. The overall pattern of the prosecutor's use of peremptory challenges is very probative of the prosecutor's intent. State v. Clark, supra, 324 N.J.Super. at 570, 737 A.2d 172. Thus "the exercise of other peremptory challenges in the case before the court is probative of that intent, regardless of when those challenges were exercised." Ibid. We find the challenge of C.E. very persuasive evidence that the prosecutor did not challenge M.S. because he was a member of any particular religion or subscribed to any particular set of religious principles, but because he was, in a general sense, likely to be demonstrative about his religion, and was thus believed by the prosecutor likely to be more forgiving and defense-oriented in a criminal trial. We defer to the trial judge's finding that the challenge of M.S. was neither based on religious principles or creed nor based on race.
We do not accept defendant's argument that people who are "demonstrative about their religions" constitute a cognizable group. As with the age-based group analysis, the boundaries of a religiously demonstrative group would be difficult or impossible to ascertain. Such a group cannot be defined by immutable characteristics, values or other criteria. Any effort to define such a group would be arbitrary. Individuals who are demonstrative about their religion do not share the same values, tenets or practices, and thus do not represent a cross-section of society. We conclude that M.S. was not challenged because of his membership in or affiliation with any cognizable group. His dismissal was not based on presumed group bias and was constitutionally proper.
Defendant's remaining argument is that his sentence is excessive. He received a minimum ten-year sentence for the first-degree robbery. We reject defendant's argument that he should have been sentenced one degree lower. He made no showing that the interest of justice demands such a sentence. N.J.S.A. 2C:44-1f(2); State v. Megargel, 143 N.J. 484, 673 A.2d 259 (1996). On the second-degree eluding and third-degree receiving *398 stolen property, he received four-year terms concurrent to each other and consecutive to the robbery. Defendant argues this sentence should have been run concurrent to the robbery. We do not agree. Defendant committed the eluding and receiving stolen property offenses on July 13, 2000 while on bail for the robbery charge, which occurred on July 7, 1999, thus establishing a presumption for consecutive sentences. N.J.S.A. 2C:44-5h. Defendant agreed to a recommendation of consecutive sentences in his plea agreement. Defendant received the benefit, as part of the plea agreement, of sentencing the eluding one degree lower. The eluding and receiving stolen property were completely independent of the robbery, committed at a different time and place, against a different victim and had different objectives. We find no abuse of discretion in imposing consecutive sentences. State v. Yarbough, 100 N.J. 627, 498 A.2d 1239 (1985). Having considered the record and the arguments presented, we are satisfied the findings of fact regarding the aggravating and mitigating factors were based on competent and credible evidence, the trial court did not apply incorrectly the sentencing guidelines enunciated in the Code, the sentence is not manifestly excessive or unduly punitive and does not constitute an abuse of discretion. State v. O'Donnell, 117 N.J. 210, 564 A.2d 1202 (1989); State v. Ghertler, 114 N.J. 383, 555 A.2d 553 (1989); State v. Roth, 95 N.J. 334, 471 A.2d 370 (1984).
Affirmed.
WEFING, J.A.D., concurring.
I write separately to note my agreement with the conclusion reached by my colleague, Judge Lisa, that defendant has failed to establish that the process of selecting a jury to hear his criminal matter was impermissibly tainted. He has clearly expressed our view that the two jurors in question, whose only apparently shared characteristic is an alleged tendency to demonstrate a strong allegiance to their religious faith, do not constitute a cognizable group for purposes of analysis under the Equal Protection Clause.
In order to constitute a cognizable class for constitutional purposes, the group must be objectively identifiable from the rest of the community, be large enough that the general community recognizes it as an identifiable group, and its members share ethnic and cultural traditions and customs, and, perhaps most important, share discrimination because of their identity and "differentness."
[State v. Guerra-Reyna, 201 Wis. 2d 751, 549 N.W.2d 779, 781 (1996).]
Judge Lisa and I concur with the implicit conclusion of the trial court that these two jurors are not members of a cognizable class.
Our colleague, Judge Fuentes, disagrees with that conclusion. He has, however, addressed an additional question: whether the exercise of peremptory challenges upon such a basis is permissible under either the Free Exercise Clause of the First Amendment to the United States Constitution or under the New Jersey State Constitution. Defendant, however, has not raised that issue in this case. Defendant's entire argument on appeal is that the peremptory strikes in question were in some manner a violation of equal protection. One will scrutinize defendant's brief in vain if searching for one reference to an infringement of the jurors' right to the free exercise of their religion. Indeed, defendant's brief contains not even one reference either to the United States Constitution or the New Jersey Constitution.
Appellate courts may, in appropriate situations, have a responsibility to raise an issue that appears clearly erroneous even *399 if a litigant has failed to do so. E & K Agency v. Van Dyke, 60 N.J. 160, 164, 286 A.2d 706 (1972) ("In the exercise of its appellate jurisdiction, a reviewing court has the power and indeed the duty to make such ultimate disposition of a case as justice requires."); City of Asbury Park v. Dep't of Civil Service, 17 N.J. 419, 423, 111 A.2d 625 (1955). This, however, in my judgment, is not such an instance.
The question of the relationship, if any, between religion and peremptory strikes has occupied much legal attention in the wake of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) with differing results. In State v. Davis, the Minnesota Supreme Court concluded that Batson did not preclude a prosecutor peremptorily striking a juror because that juror was a Jehovah's Witness. 504 N.W.2d 767 (Minn.1993).
In State v. Hodge, 248 Conn. 207, 726 A.2d 531 (1999), the Connecticut Supreme Court reached an opposite conclusion to Davis, holding that a peremptory strike exercised on the basis that the potential juror was a Muslim would be a violation of equal protection. The court also concluded, however, that in that particular case the peremptory strike was exercised for reasons other than the juror's religious affiliation. 726 A.2d at 553. The United States Supreme Court again declined to grant certification, leaving the conflict unresolved. Hodge v. Connecticut, 528 U.S. 969, 120 S.Ct. 409, 145 L.Ed.2d 319 (1999).
Other courts across the country have treated the question unevenly. State v. Purcell, 199 Ariz. 319, 18 P.3d 113 (Ct. App.2001) (holding it would be a violation of Batson to strike a juror on the ground she was Roman Catholic but upholding the trial court's ruling that the strike was for other, neutral reasons); People v. Martin, 64 Cal.App. 4th 378, 75 Cal.Rptr.2d 147 (1998) (prosecutor's strike of Jehovah's Witness as a juror permissible on the basis of prosecutor's understanding that Witnesses decline to judge others); Pryor v. Hoskins, 774 N.E.2d 943 (Ind.Ct.App.2002) (defendants sought to strike a juror on the ground that her religious involvement could lead her to identify with plaintiff; trial court erred in denying the strike); Thorson v. State, 721 So.2d 590 (Miss.1998) (trial court erred in permitting prosecutor to strike two jurors merely because they were members of the Holiness Church); Casarez v. State, 913 S.W.2d 468 (Tex. Crim.App.1994) (Batson does not extend to peremptory strikes based upon religious grounds); U.S. v. Stafford, 136 F.3d 1109 (7th Cir.1998) (while a peremptory strike based on religious affiliation may be impermissible, a strike based on a "religious outlook that might make the prospective juror unusually reluctant, or unusually eager, to convict a criminal defendant" is distinguishable; the court described the question as "unsettled.") Cases are collected in 63 ALR 5th 375, Annotation, Use of Peremptory Challenges to Exclude Persons from Criminal Jury Based on Religious AffiliationPost-Batson State Cases.
Writers have also split upon the question. Thou Shalt Not Strike: Religion-Based Peremptory Challenges Under the Washington State Constitution, 25 Seattle U.L.Rev. 451 (2001) (recognizing that "[t]he most difficult evaluations will involve beliefs that may render the juror either overly reticent or zealous in convicting a criminal defendant."); What is "Religion" in Religion-Based Peremptory Challenges?, 65 U. Cin. L.Rev. 1291 (1997) (noting that "courts that see religion as another cognizable group tend to bar the use of religion-based peremptories. However, the courts that view religion primarily as assent to specific beliefs hold that religion-based peremptories are permissible."); *400 The Equal Protection Clause, The Free Exercise Clause and Religion-Based Peremptory Challenges, 63 U. Chi. L.Rev. 1639 (1996) (noting that "it is generally accepted that the intensity of one's religious beliefs is an accurate predictor of one's views on many issues. This means that, although knowing a venireman's religion is not very helpful for predicting his vote, knowing how religious the venireman is might be" and advocating forbidding affiliation-based peremptory challenges while retaining belief-based peremptory challenges); Religion-Based Peremptory Challenges after Batson v. Kentucky and J.E.B. v. Alabama: An Equal Protection and First Amendment Analysis, 94 Mich. L.Rev. 191 (1995); The Batson Analysis and Religious Discrimination, 74 Or. L.Rev. 721 (1995).
The question whether Batson principles should be extended to bar peremptory strikes based upon the Free Exercise Clause of the First Amendment involves profound policy questions and requires close analysis of its implications. It is not an issue we should address when the parties have not seen fit to do so and have not created an adequate record to permit full consideration. Kimmel v. Dayrit, 154 N.J. 337, 342, 712 A.2d 1129 (1998).
Judge Lisa joins in this opinion.
FUENTES, J.A.D., dissenting.
The question presented in this case is whether the decisions of our Supreme Court in State v. Gilmore, 103 N.J. 508, 511 A.2d 1150 (1986), and of the United States Supreme Court in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), permit the State to use peremptory challenges to exclude from a jury in a criminal case, individuals who are perceived as demonstratively religious. My colleagues in the majority have concluded that the answer is "yes." I disagree and therefore dissent.
A proper analysis of the constitutional issues raised here requires a detailed recitation of the relevant facts. In the course of jury selection, the following exchange took place between the court and the person identified as juror number one:
THE JUROR:
My name is [C.E.] I have been working as a Missionary for the past two years. I'm married, my wife also works as a Missionary. We have two children that are adults that work outside the home. They're both college students and they both work umm at a supermarket.
I've served on a Petit Jury twice before, I believe about 15 years ago, and about 18 years ago. Both were criminal cases and the jury reached a verdict in both cases. I don't have any friends or relatives in law enforcement. About 22 or 23 years ago, I was a victim of a crime. My car was stolen, used in a bank hold up and then dropped off. It was recovered the same day.
I also have a friend who's a Missionary over in Russia, who I work with. His vehicle was stolen about a year-and-a-half ago, over there.
The jury selection process resumed with the following exchange taking place between the court and an individual identified as juror number four:
THE JUROR:
My name is [M.S.]. I'm a boil [sic] operator forquestion number two, I'm a boiler operator for East Orange Board of Ed. Yes, I am married, for question number three. My spouse, yes, she does work outside the home. She works for Summit Bank. No to question number five. I don't have any children that work. Question number six, no. I have never served on a Petit or Grand Jury.

*401 Question number seven, I have an aunt that works for the Newark Police Department.
THE COURT:
Do you see her often?
THE JUROR:
Umm, yeah. Maybe like twice a month, I guess.
THE COURT:
Does she talk about her work?
THE JUROR:
No, just family stuff.
THE COURT:
And your relationship with her wouldn't affect your ability to be fair and impartial?
THE JUROR:
No, it wouldn't.
THE COURT:
Fine
DEFENSE COUNSEL:
Judge, would you mind inquiring what she does for the Newark Police Department?
THE COURT:
Her position with the Newark Police Department?
THE JUROR:
Umm, I basically don't know the title. I just know she takes pictures of deceased bodies. I don't know what thereI don't know the title, but she takes pictures of people that have been deceased, in the hospital. She go [sic] around and takes the pictures.
DEFENSE COUNSEL:
Thank you, Judge.
THE JUROR:
Question number eight, no. Oh, excuse me, I'm sorry. I misread that. Question number eight, yes. In `95, my brother was killed by a gunshot. He got shot. He was killed back in `95.
THE COURT:
Would you like to talk about that at side bar?
THE JUROR:
Oh, no, no.
THE COURT:
Would that episode
THE JUROR:
No
THE COURT:
or that fact have any impact on you in this case to decide
THE JUROR:
No
THE COURT:
to decide this case fairly and impartially?
THE JUROR:
No, that's a different casenot at all, not at all ...
Both jurors also indicated that they were able to judge the believability of all witnesses by the same standards, regardless of their occupation or level of education, "including the testimony of law enforcement officers." *402 When the State exercised its peremptory challenges to excuse these two potential jurors, defense counsel objected. The prosecutor then volunteered the following explanation for his actions.
Well, to make sure we are very clear about this, Judge, the first juror who was excused, [C.E.], who was a missionary and white. [A]nd the last juror was excused [was] black, [M.S.], is Muslim. And I have found with regard to juror number one, juror number four that people who tend to be demonstrative about their religions tend to favor defendants to a greater extent than do persons who are, shall we say, not as religious. So that those are the reasons for my excusals [sic] of the jurors at this point.
This prompted defense counsel to point out that no "testimony" had been received from juror number four [M.S.] about his religious beliefs in order to determine how any such particular beliefs would impact on the case. In response, the prosecutor stated:
[A]nd [M.S.], the gentleman who came in wearing head to toe black and a skull cap is obviously a Muslim.
Immediately following this statement the following exchange took place:
DEFENSE COUNSEL:
So, you're discriminating against his religion; not his race. Is what you're saying on the record?
PROSECUTOR:
No, [addressing defense counsel], and I suggest you tread carefully making accusations because you've just committed an ethical violation, to accuse someone of a discrimination or prejudice. I suggest you mark your words well, Madam.
DEFENSE COUNSEL:
Your Honor, I wasn't making accusation [sic]; I was just rephrasing what the Prosecutor just said.
THE COURT:
Well, both arguments have been placed on the record. I find both to be in equipoise. I don't find anything objectionable, as far as what the State has done, and [defense counsel] has placed her objections clearly on the record. We'll just continue.
After the conclusion of the trial, defense counsel moved for a new trial arguing that the prosecutor's dismissal of juror number four was based on "assumptions about his religion based on the way he was dressed, without knowing whether he had any particularly strong religious beliefs or not." In response, the prosecutor stated:
[W]hite juror I dismissed, I believe, was a minister, if memory serves me correctly, or was a missionaryI tend to forget; but had some sort of religious affiliation. And the other juror was, apparently, Muslim, I would say, based upon his dress and the name, if I'm not mistaken. But I did not dismiss any juror because of religious beliefs.
I think what I said was it's been my experience that persons who strongly profess to religious belief or religious persuasion might be more lenient towardmight be more forgiving toward a defendant, and might not listen to the evidence as perhaps they should. They may very well tend to be more accepting of a person's professions of innocence in the face of facts to the contrary. And that's why I exercised those challenges.
....
He [M.S.] wasI'm not really sure what particular name you give the garb, but he was wearing a skull cap or a rather long outer garment. And I believe I *403 commented [at] the time that, you know, it was obvious he [M.S.] was apparently very devout in his faith, and that's what led me to believe that he might be sympathetic toward the defendant; despite facts that might go to the contrary.
And the man who was the minister indicated to us that that was his profession, that's how we happened to know. So, there were other obvious manifestations and that's something that we drew conclusions to. (Emphasis added.)
At the conclusion of oral argument, the trial judge made the following findings:
As to the Court finding concerning this motion, the Court finds that the reasons that were placed on the record by [the prosecutor] were more than adequate with respect to the peremptory challenges. The Court further finds that the reasons also given would indicate that the Prosecutor excused these jurors specifically for situation specific reasons. Accordingly, with respect to the motion for a new trial based upon those grounds, the motion will be denied. (Emphasis added.)

ANALYSIS UNDER THE FEDERAL CONSTITUTION
The United States Supreme Court has held that the Equal Protection Clause of the Fourteenth Amendment forbids a prosecutor or defendant from exercising peremptory challenges to remove jurors on the basis of race, ethnicity or gender. J.E.B. v. Alabama, 511 U.S. 127, 146, 114 S.Ct. 1419, 1430, 128 L.Ed.2d 89, 107-08 (1994) (gender); Hernandez v. New York, 500 U.S. 352, 370-71, 111 S.Ct. 1859, 1872, 114 L.Ed.2d 395, 412 (1991) (ethnicity); Batson v. Kentucky, supra, 476 U.S. at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87 (race). However, the Court has not directly addressed the question of whether the reasoning in Batson and J.E.B. can be invoked to prohibit peremptory challenges based upon religion.[4]
In Davis v. Minnesota, 511 U.S. 1115, 114 S.Ct. 2120, 128 L.Ed.2d 679 (1994), the Court denied a petition for certiorari, in State v. Davis, 504 N.W.2d 767 (Minn. 1993), in which the Minnesota Supreme Court held that the Federal Constitution does not prohibit a party from exercising a peremptory challenge on the basis of religion. However, in State v. Hodge, 248 Conn. 207, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S.Ct. 409, 145 L.Ed.2d 319 (1999), the Connecticut Supreme Court reached the opposite conclusion, holding that the Fourteenth Amendment prohibits the exercise of peremptory challenges to excuse jurors because of religious affiliation. The Hodge court noted that "[a]lthough one's religious beliefs may render a prospective juror unsuitable for service in a particular case, one's religious affiliation, like one's race or gender, bears no relation to that person's ability to serve as a juror." 726 A.2d at 553. A similar conclusion was reached by the California Court of Appeals in People v. Martin, 64 Cal.App.4th 378, 75 Cal.Rptr.2d 147, 151 (1998), which held that although it was unconstitutional to exclude a juror on the basis of religious affiliation, it was nevertheless permissible to exclude a juror on the basis of his or her own religious beliefs.
*404 It is noteworthy that the Minnesota Supreme Court decided Davis before the United States Supreme Court decided J.E.B. Thus, analyzing the issue in a postJ.E.B. environment, the Connecticut Supreme Court concluded in Hodge: "We cannot discern, nor has the state brought to our attention, any `principled basis ... for confining the holding in J.E.B. to the context of sex.'" 726 A.2d at 552 (quoting Davis v. Minnesota, supra, 511 U.S. at 1117, 114 S.Ct. at 2122, 128 L. Ed.2d at 680 (Thomas, J. dissenting)). I reach the same conclusion and will apply the constitutional principles of Batson and J.E.B. to my analysis of the issues presented here.[5]
My analysis of this issue will be guided by the fundamental constitutional principle articulated by Justice O'Connor in her dissent in Metro Broad., Inc. v. F.C.C., 497 U.S. 547, 602, 110 S.Ct. 2997, 3028, 111 L.Ed.2d 445 (1990), rev'd, by Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158, (1995):
At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens `as individuals, not `as simply components of a racial, religious, sexual or national class.'
[ (O'Connor, J., dissenting) (quoting Arizona Governing Comm. for Tax Deferred Annuity and Deferred Compensation Plans v. Norris, 463 U.S. 1073, 1083, 103 S.Ct. 3492, 3498, 77 L.Ed.2d 1236 (1983)).]
In Batson, the Court recognized that discrimination in the selection of jurors harms both the defendant and the excluded juror. The Court underscored the basic tenet underpinning our system of jury service: "Competence to serve as a juror ultimately depends on an assessment of individual qualifications and ability impartially to consider evidence presented at a trial." 476 U.S. at 87, 106 S.Ct. at 1718, 90 L.Ed.2d at 89. In J.E.B. the Court reaffirmed the critical importance of jury service as an indispensable aspect of citizenship.
Equal opportunity to participate in the fair administration of justice is fundamental to our democratic system. It not only furthers the goals of the jury system. It reaffirms the promise of equality under the lawthat all citizens, regardless of race, ethnicity, or gender, have the chance to take part directly in our democracy. Powers v. Ohio, 499 U.S. at 407, 111 S.Ct. at 1369, [113 L.Ed.2d 411], (`Indeed, with the exception of voting, for most citizens, the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process'). When persons are excluded from participation in our democratic processes solely because of race or gender, this promise of equality dims, and the integrity of our judicial system is jeopardized.
[J.E.B., supra, 511 U.S. at 146, 114 S.Ct. at 1430, 128 L.Ed.2d at 107.]
Because the right to nondiscriminatory jury selection procedures belongs to both the defendant and the potential jurors: "The exclusion of even one juror for impermissible reasons harms that juror and undermines public confidence in the fairness of the system." Id., 511 U.S. at 142, n.
*405 13, 114 S.Ct. at 1428, n. 13, 128 L.Ed.2d at 105, n. 13.
The constitutional principles expressed above apply with equal force to a juror who is excluded from participating in a jury because of religious beliefs. It matters not how that belief is manifested. Here, the religious belief was expressed by the jurors' religious garment and chosen profession. It is undisputed that the juror perceived by the prosecutor as a Muslim is expressing an aspect of his faith which requires him to wear a long garment and what is described as a "skull cap."[6] By the same token, it is reasonable to infer that the juror identified as a missionary is responding to an aspect of his faith which called upon him to proselytize and otherwise devote his life to the dissemination of his religious beliefs. These were the messages conveyed to and received by the State with unmistakable clarity. These constitutionally protected expressions of religiosity were also the exclusive bases for the State's peremptory challenges.
The State's use of peremptory challenges specifically targeting jurors because of their religious beliefs triggers a strict scrutiny analysis. Church of the Lukumi Babalu Aye, Inc., v. Hialeah, 508 U.S. 520, 546, 113 S.Ct. 2217, 2233, 124 L. Ed.2d 472, 498 (1993); Larson v. Valente, 456 U.S. 228, 246, 102 S.Ct. 1673, 1684, 72 L. Ed.2d 33, 49 (1982). Under this heightened level of judicial review, the State must demonstrate that discrimination on the basis of religious beliefs, as expressed here by an individual's attire or chosen profession, is narrowly tailored to further its legitimate interest in achieving a fair and impartial trial. J.E.B., supra, 511 U.S. at 137, 114 S.Ct. at 1426, 128 L. Ed.2d at 102. The absence of narrow tailoring is sufficient to establish the invalidity of the governmental action. Arkansas Writers' Project, Inc., v. Ragland, 481 U.S. 221, 232, 107 S.Ct. 1722, 1729, 95 L.Ed.2d 209, 221-23 (1987).
Here, the prosecutor did not know the specific religion of either of the men challenged. With respect to the juror perceived to be a Muslim, there is no evidence concerning the sect to which he belonged or what specific religious beliefs he espoused. There is also only the most cursory information as to the juror identified as a missionary. Neither man was questioned about his personal religious convictions.[7] There was also no evidence that the jurors' beliefs prevented them from following the court's instructions and deliberating in an unbiased manner. Finally, we must keep in mind that the factual issues in this case have absolutely nothing to do with religion. This case is about a robbery. Defendant entered a Chinese takeout restaurant, pointed what turned out to be a water-gun at the proprietor and demanded money. Defendant's defense strategy did not involve religion in any way.
This stands in sharp contrast to the circumstances confronted by the Second Circuit in U.S. v. Berger, 224 F.3d 107, 120 (2d Cir.2000). In Berger several residents of a Hasidic Jewish community were charged with conspiracy to defraud the federal government by obtaining grant *406 money for members of the community who were falsely enrolled in a non-existent Jewish Seminary school. The prosecutor challenged a prospective juror who was a Rabbi, wore a yarmulke and identified himself as "an observant Jew," based upon the belief that the Rabbi would carry undue influence in jury deliberations because of his expertise in Jewish educational matters. In upholding the prosecutor's challenge, the court distinguished between religious affiliation and personal bias. The court found the prosecutor's proffered reason for the challenge religion-neutral. It observed that "the government did not strike the Rabbi because of his general religious experiences and knowledge, but rather because of his particular familiarity with Jewish educational institutions, the very subjects of the case against the appellants." 224 F. 3d at 120.
Here, the targeting of jurors for exclusion in jury service because they are perceived as having religious beliefs deemed unacceptable to the State, not on the basis of any particular, case-specific bias, but simply on the prosecutor's personal experiences, utterly fails to provide a narrowly tailored, constitutionally-acceptable rationale for exclusion. Such use of peremptory challenges openly exhibits an untenable hostility towards religious expression based only on stereotypic notions of group bias. This is reminiscent of Justice Blackmun's observation in J.E.B.: "Respondent seems to assume that gross generalizations that would be deemed impermissible if made on the basis of race are somehow permissible when made on the basis of gender." J.E.B., supra, 511 U.S. at 139-40, 114 S.Ct. 1419.
The State's exclusion of these two jurors on the basis of strongly held religious beliefs also violates the First Amendment right to Free Exercise of religion as applied to the states through the Fourteenth Amendment. U.S. Const. amends. I, XIV; see also Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213, 1217-18 (1940).
In McDaniel v. Paty, 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978), a candidate for delegate to a Tennessee constitutional convention brought a declaratory judgment action seeking to disqualify an opposing candidate who was a Baptist minister under the State's constitutional provision which barred "ministers of the Gospel or priests of any denomination whatever." The Court held the Tennessee provision unconstitutional, in violation of the Free Exercise Clause. In a concurring opinion Justice Brennan wrote:
The characterization of the exclusion as one burdening appellant's `career or calling' and not religious belief cannot withstand analysis. Clearly freedom of belief protected by the Free Exercise Clause embraces freedom to profess or practice that belief, even including doing so to earn a living. One's religious belief surely does not cease to enjoy the protection of the First Amendment when held with such depth of sincerity as to impel one to join the ministry.

* * * * * *
The [Tennessee] provision imposes a unique disability upon those who exhibit a defined level of intensity of involvement in protected religious activity. Such a classification as much imposes a test for office based on religious conviction as one based on denominational preference. A law which limits political participation to those who eschew prayer, public worship, or the ministry as much establishes a religious test as one which disqualifies Catholics, or Jews, or Protestants. (Citations omitted.) *407 [435 U.S. at 631-32, 98 S.Ct. at 1330-31, 55 L.Ed.2d at 603-04. (Brennan, J. concurring.) ].
The State's use of peremptory challenges here is equally repugnant to the Free Exercise Clause. The fact that the peremptory exclusions may appear to be nondenominational is of no moment. The challenges were based entirely on the State's perception of these two jurors as particularly "devout" or "demonstrative" in their faith based on either a religious calling or a manifestation of religious convictions based on attire. Thus, the State's use of peremptory challenges amounts to an unconstitutional imposition of a "special disability" on the basis of religious views or status. Employment Div., Dept. of Human Resources of Ore. v. Smith, 494 U.S. 872, 877, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876, 884 (1990); Wisconsin v. Yoder, 406 U.S. 205, 220, 92 S.Ct. 1526, 1535, 32 L. Ed.2d 15, 28 (1972); Sherbert v. Verner, 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L. Ed.2d 965, 970 (1963). The State cannot condition a citizen's right to participate in jury service upon the suppression of constitutionally protected religious expression. New Jersey Bd. of Higher Educ. v. Shelton Coll., 90 N.J. 470, 482, 448 A.2d 988 (1982).
If the discriminatory practice involved here is validated by judicial countenance, courtrooms would become places where the fundamental freedoms guaranteed by the First Amendment would cease to exist and crucifixes, yarmulkas and other forms of religious expression and symbols of affiliation would be transformed into per se indicias of juror disqualification.

ANALYSIS UNDER THE NEW JERSEY CONSTITUTION
Our Supreme Court has declared that Article I, paragraphs 5, 9 and 10 of the New Jersey Constitution, when read together:
[G]uarantee that in all criminal prosecutions the defendant is entitled to trial by an impartial jury without discrimination on the basis of religious principles, race, color, ancestry, national origin, or sex.
[State v. Gilmore, supra, 103 N.J. at 524, 511 A.2d 1150.]
Paragraph 5 specifically provides that:
No person shall be denied the enjoyment of any civil or military right, nor be discriminated against in the exercise of any civil or military right ... because of religious principles, race, color, ancestry or national origin.
[N.J. Const. art. I, ¶ 5.]
The Gilmore court held that this constitutional provision:
[I]mplicates not only the defendant's civil rights but also those of citizens generallyand, historically, one of the rights and obligations of citizenship has been to participate in the administration of justice by serving on grand and petit juries. Concomitantly, the representative cross-section rule not only promotes the overall impartiality of the deliberative process but also enhances the legitimacy of the judicial process in the eyes of the public by serving the following `other essential functions': `legitimating the judgments of the courts, promoting citizen participation in government, and preventing further stigmatizing of minority groups.' (citations omitted.)
[Id. 103 N.J. at 525, 511 A.2d 1150.]
No reported decision in this State has addressed the question of juror exclusion based on the exercise of religious principles. My colleagues in the majority believe that the constitutional guarantees embodied in Paragraph 5 should be narrowly construed to limit their applicability to denominational-based discrimination. That is, in order for a peremptory challenge to run afoul of the constitutional *408 proscription against discrimination based on the exercise of religious principles, it must specifically target a juror because he or she is Catholic, or Jewish, or Protestant, or of the Muslim faith. Only these type of designations constitute a cognizable group worthy of constitutional protection. This is so because individuals who are merely "demonstrative about their religions... cannot be defined by immutable characteristics, values or other criteria. Any effort to define such a group would be arbitrary. Individuals who are demonstrative about their religion do not share the same values, tenets or practices, and thus do not represent a cross-section of society." Ante at 280, 812 A.2d at 397.
With respect to my colleagues, such a limited view of the protections extended by Paragraph 5 reduces an individual's religious beliefs to the status of group membership, without the concomitant fundamental right to publicly follow the teachings of one's faith, whether in the form of religious attire or through the pursuit of a missionary calling. Unlike race, gender, ethnicity or national origin, where the individual's protected status is derived from being part of a group with readily apparent and "immutable characteristics," the protection afforded to "religious principles" under Paragraph 5 must include both denominational affiliation and the right to freely and openly express the precepts of one's faith. To protect the former but leave the latter exposed to invidious assaults would render meaningless the constitutional guarantee of religious freedom.
In further contrast to race, ethnicity or national origin, religious principles are, by their very nature, always subject to change.[8] Today's Catholic may be tomorrow's Protestant. The pursuit of spiritual fulfillment is a lifelong journey, often involving many divergent paths. However, the Constitution does not protect only those religious principles which are not subject to revision or kept hidden from public view or held with ambivalence. The Constitution protects all religious convictions, those of the devout as well as those of the agnostic, those which are kept private as well as those which are demonstratively held. Neither piety nor agnosticism can ever be the target of governmental action.
The procedural machinery for the enforcement of the Gilmore principles should remain unchanged when applied to review religion-based peremptory challenges. Once a prima facie showing of impermissible discrimination has been established, the burden shifts to the party exercising the peremptory challenge to indicate a situation-specific bias exhibited by the targeted juror. A party faced with this burden must articulate grounds which are reasonably relevant to the particular case on trial or its parties or witnesses, and that make excusing the juror rational and desirable. State v. Chevalier, 340 N.J.Super. 339, 349, 774 A.2d 597 (App.Div.), certif. denied, 170 N.J. 386, 788 A.2d 771 (2001). The State's reasons here do not meet the required constitutional standard.
I conclude my analysis by embracing the words of Justice Kennedy in Church of the Lukumi Babalu Aye, Inc., v. Hialeah, supra:
The Free Exercise Clause commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from *409 animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures. Those in office must be resolute in resisting importunate demands and must ensure that the sole reasons for imposing the burdens of law and regulation are secular. Legislators may not devise mechanisms, overt or disguised, designed to persecute or oppress a religion or its practices. The laws here in question were enacted contrary to these constitutional principles, and they are void.
[508 U.S. at 547, 113 S.Ct. at 2234, 124 L.Ed.2d at 499.]
Because the prosecutor's use of peremptory challenges to remove these two jurors was based on constitutionally impermissible grounds, I would order a new trial.
NOTES
[1] Throughout this opinion we have used initials rather than jurors' names. There is no dispute that the full name of M.S. is a Muslim name.
[2] N.J.S.A. 2A:72-7 was repealed by L.1995, c. 44, § 3, effective June 5, 1995.
[3] The defendant in the case was the son of a Baptist minister, and it was anticipated that defendant's parents and other Baptist ministers would testify as alibi or character witnesses. State v. Gilmore, 199 N.J.Super. 389, 410, 489 A.2d 1175 (App.Div.1985).
[4] The Court has stated in dicta that "[i]n our heterogeneous society policy as well as constitutional considerations militate against the divisive assumptionas a per se rulethat justice in a court of law may turn upon the pigmentation of skin, the accident of birth, or the choice of religion." Georgia v. McCollum, 505 U.S. 42, 59, 112 S.Ct. 2348, 2359, 120 L.Ed.2d 33, 51 (1992) (quoting Ristaino v. Ross, 424 U.S. 589, 596 n. 8, 96 S.Ct. 1017, 1021, 47 L. Ed.2d 258, 264 (1976)).
[5] Several scholarly commentators have also concluded that the reasoning in Batson and J.E.B. prohibit the use of religion-based peremptory challenges. See generally, Benjamin Hoorn Barton, Note, Religion-Based Peremptory Challenges After Batson v. Kentucky and J.E.B. v. Alabama: An Equal Protection and First Amendment Analysis, 94 Mich. L.Rev. 191 (1995); Julie D. Arp, Note, The Batson Analysis and Religious Discrimination, 74 Or. L.Rev. 721 (1995); Amy B. Gendleman, Comment, The Equal Protection Clause, the Free Exercise Clause and Religion-Based Peremptory Challenges, 63 U. Chi. L.Rev. 1639 (1996).
[6] The term "skull cap" is an apparent reference to a Muslim prayer cap called a "kufi."
[7] "It is clear that the entire voir dire examination must be conducted so that parties may intelligently exercise their peremptory challenges." See Pressler, Current N.J. Court Rules, comment 1 on R. 1:8-3(a) (2003). However, given the absence of any issues touching upon religion, it would have been inappropriate for the court to allow any inquiry into the jurors' personal religious beliefs. Ham v. South Carolina, 409 U.S. 524, 93 S.Ct. 848, 35 L. Ed.2d 46 (1973); State v. Deatore, 70 N.J. 100, 104-106, 358 A.2d 163 (1976).
[8] I have intentionally left out gender since modern medical science provides a surgical option to those individuals suffering from gender dysphoria. See Enriquez v. West Jersey Health Sys., 342 N.J.Super. 501, 777 A.2d 365, certif. denied., 170 N.J. 211, 785 A.2d 439 (2001).