862 A.2d 1130

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. LLOYD FULLER, DEFENDANT–APPELLANT.

Argued December 2, 2003—Decided December 22, 2004.

*Frank J. Pugliese,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Deborah C. Bartolomey,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

*Ronald K. Chen* argued the cause for *amicus curiae* American Civil Liberties Union of New Jersey (*Frank Askin,* Director, Rutgers Constitutional Litigation Clinic, attorney; *Edward L. Barocas* and *J.C. Salyer,* of counsel and on the brief).

*Stephen M. Latimer* submitted a brief on behalf of *amicus curiae* The Rutherford Institute (*Loughlin & Latimer,* attorneys).

Chief Justice PORITZ delivered the opinion of the Court.

This appeal raises the question whether a prosecutor may use peremptory challenges to excuse a potential juror who wears clothing associated with a religious group or who indicates in *voir dire* that he has worked as a missionary. During jury selection for defendant's trial, the prosecutor used four of his first five peremptory challenges to excuse African–American venirepersons. Defense counsel objected on the ground that those strikes constituted impermissible discrimination under *State v. Gilmore,* in which we held that a prosecutor may not use peremptory challenges to exclude African Americans from the petit jury solely

because the prosecutor believes that African Americans have a group bias. 103 *N.J.* 508, 517, 511 *A.*2d 1150 (1986) (*Gilmore*). The prosecutor responded, in part, that two of the potential jurors he had excused were "demonstrative about their religions," and that in his experience, such persons "tend to favor defendants to a greater extent than do persons who are, shall we say, not as religious." The trial court accepted the prosecutor's explanation and, subsequently, denied a motion for a new trial that raised the same issue.

Defendant appealed, and a divided panel of the Appellate Division affirmed. The majority distinguished between peremptory challenges exercised to exclude members of particular religious groups and peremptory challenges exercised to exclude persons the prosecutor believes have a pro-defendant bias because they are religious. *State v. Fuller*, 356 *N.J.Super.* 266, 279–80, 812 *A.*2d 389 (App.Div.2002), *certif. denied,* 176 *N.J.* 426, 824 *A.*2d 156 (2003). In the view of the majority, the former constitutes discrimination based on "religious principles" and is prohibited by Article I, paragraph 5 of the New Jersey Constitution, whereas the latter is permissible because persons who are "demonstrative about their religions" are not part of a cognizable group capable of being targeted for group bias. *Ibid.* The dissent found that state discrimination against persons "demonstrative about their religions" offends the Equal Protection Clause of the Fourteenth Amendment and the Free Exercise Clause of the First Amendment, as well as the prohibition against discrimination based on "religious principles" found in Article I, paragraph 5 of the New Jersey Constitution. *Id.* at 294–98, 812 *A.*2d 389.

This appeal is before us as of right based on the dissent in the Appellate Division. *R.* 2:2–1(a)(2).

## I.

Defendant Lloyd Fuller was indicted on charges of first-degree robbery, in violation of *N.J.S.A.* 2C:15–1, and fourth-degree possession of an imitation firearm for unlawful purposes, in violation

of *N.J.S.A.* 2C:39–4(e). The details relating to defendant's indictments, including the participants and the events, are relevant to this appeal only to the extent that they lack any connection to religion.

Defendant's trial began with jury selection on October 24, 2000. As prescribed by rule, the trial court conducted *voir dire* of potential jurors, excusing certain members of the pool for cause and permitting the parties to exercise peremptory challenges. *See R.* 1:8–3. The prosecutor used his first challenge to excuse a white juror, C.E., who disclosed that he and his wife worked as missionaries. When the prosecutor used his next four challenges against African Americans, and after the last of those potential jurors, M.S., was excused, defense counsel objected to the manner in which the prosecutor had exercised his peremptory challenges. Counsel pointed out that the prosecutor had challenged four African–American jurors in a row, and that in respect of all but the first, the *voir dire* had not suggested they would be unable to serve. The prosecutor responded with his reasons for excusing the four African–American jurors:

> Well, to make sure we are very clear about this, Judge, the first juror who was excused was [C.E.], who was a missionary and white. . . . The next three who were black all had members of their family or friends who were convicted of crimes.
>
> And the last juror [who] was excused was also black, [M.S.], [and] is Muslim. And I have found with regard to juror number one [C.E.], juror number four [M.S.] that people who tend to be demonstrative about their religions tend to favor defendants to a greater extent than do persons who are, shall we say, not as religious. So . . . those are the reasons for my excusals of the jurors at this point.

There is no information in the record concerning M.S.'s religious beliefs or how those beliefs might prevent him from sitting on the jury. In his responses during *voir dire*, M.S. did not discuss his religious convictions or say that he anticipated any difficulty in serving fairly and impartially.[1] And the prosecutor, for his part, did not inquire whether M.S.'s religious beliefs would interfere

---

[1] M.S. did reveal that his brother was shot and killed in 1995. He declined to talk about the issue further before the court or at side bar but stated that his brother's death would not affect his ability to serve as a fair and impartial juror.

with his ability to follow the court's instructions or to deliberate in an unbiased manner. The prosecutor nonetheless argued that the adequacy of his reasons for challenging M.S. were self-evident, that "the gentleman who came in wearing head to toe black and a skull cap is obviously Muslim, M U S L I M."

The trial court overruled defense counsel's objection, and the jury convicted defendant on both counts of the indictment. Thereafter, defense counsel filed a motion for a new trial pursuant to *Rule* 3:20–1 based on alleged constitutional violations in the course of jury selection. At that point, the prosecutor asserted that he had not dismissed anyone "because they were of any particular religion or belief." He explained:

> [The w]hite juror I dismissed, I believe, was a minister, if memory serves me correctly, or was a missionary—I tend to forget; but had some sort of religious affiliation. And the other juror was, apparently, Muslim, I would say, based upon his dress and the name, if I'm not mistaken. But I did not dismiss any juror because of religious beliefs.
>
> I think what I said was it's been my experience that persons who strongly profess to religious belief or religious persuasion might be more lenient toward— might be more forgiving toward a defendant, and might not listen to the evidence as perhaps they should. They may very well tend to be more accepting of a person's professions of innocence in the face of facts to the contrary.
>
> . . . .
>
> So, therefore, Judge, Gilmore really does not apply here. Gilmore is really applicable when there is an obvious attempt to exclude jurors of a particular race, a particular religious group. That is not what we had here. . . .
>
> I don't even think [defense counsel] can say with utmost honesty what the ultimate religious composition of the jury was. I certainly can't. I don't think the Court can either.
>
> . . . .
>
> [M.S.] was—I'm not really sure what particular name you give the garb, but he was wearing a skull cap or a rather long outer garment. And I believe I commented [at] the time that, you know, it was obvious he was apparently very devout in his faith, and that's what led me to believe that he might be sympathetic toward the defendant; despite facts that might go to the contrary.
>
> And [C.E.] who was the minister indicated to us that that was his profession, that's how we happened to know. So, there were other obvious manifestations and that's something that we drew conclusions to.

In essence, the prosecutor argued that his use of peremptory challenges did not offend *Gilmore* because he lacked motive to discriminate against particular religious beliefs as evidenced by his having made no effort to learn either the religious affiliations of any potential juror or the religious composition of the jury ultimately empanelled. Rather, he took exhibitions of religious devotion as an indication of lenient tendencies towards the defense, a permissible basis for exclusion unlike the discrimination barred by *Gilmore*. Accepting the prosecutor's argument, the trial court, relying on *State v. Watkins*, 114 *N.J.* 259, 263, 553 *A.*2d 1344 (1989), distinguished the use of peremptory strikes based on presumed "group bias, which is unconstitutional[, from] situation specific bias, which is permitted." Because the court found situation-specific bias in this case, it denied defendant's motion for a new trial.

A divided panel of the Appellate Division affirmed. *Fuller, supra*, 356 *N.J.Super.* at 270, 812 *A.*2d 389. The majority opined that, as a threshold matter in any *Gilmore*-based " 'equal protection or fair cross-section claim, a defendant must first identify a constitutionally cognizable group, *i.e.*, a group capable of being singled out for discriminatory treatment.' " *Id.* at 278, 812 *A.*2d 389 (citation omitted). Because "people who are demonstrative about their religions [do not] constitute a cognizable group," defendant could not meet that requirement. *Id.* at 280, 812 *A.*2d 389 (internal quotations omitted). The majority viewed this case as analogous to *State v. Bellamy*, 260 *N.J.Super.* 449, 453, 616 *A.*2d 1323 (App.Div.1992), *certif. denied*, 133 *N.J.* 436, 627 *A.*2d 1141 (1993), wherein the court held that "age-defined groups are not cognizable for purposes of impartial jury analysis." 356 *N.J.Super.* at 278, 812 *A.*2d 389. Similarly, people who are "demonstrative about their religions" are no more cognizable than age-defined groups, which do not "hold cohesive and consistent values and attitudes or ... attitudes [that] are substantially different from other segments of the community." *Id.* at 278–79, 812 *A.*2d 389 (citing *Bellamy, supra*, 260 *N.J.Super.* at 454–55, 616 *A.*2d 1323).

The majority recognized that "Article I, paragraph 5 of the New Jersey Constitution, which underpins *Gilmore,* does not contain a prohibition of discrimination based on age, whereas it does prohibit discrimination based on 'religious principles,' " but concluded that only when discrimination is directed against persons adhering to specific religious faiths, for example, Catholics, Jews, or Muslims, is there a claim against a cognizable group that offends the constitutional guarantee. *Id.* at 279, 812 *A.*2d 389. In support of that position, the majority pointed out "that in *Gilmore,* [this] Court found the constitutional proscription against discrimination based on 'religious principles' congruent with the then-statutory proscription of *N.J.S.A.* 2A:72–7 prohibiting discrimination in jury selection based on 'creed.' " *Ibid.* (citing *Gilmore, supra,* 103 *N.J.* at 526, 511 *A.*2d 1150) (footnote omitted). It followed that if the prosecutor used a peremptory challenge to excuse M.S. based on his presumed adherence to the Muslim faith, then "the exclusion would be constitutionally impermissible," *id.* at 279, 812 *A.*2d 389; by contrast, the prosecutor in this case stated that he "did not dismiss any juror because of religious beliefs." *Id.* at 280, 812 *A.*2d 389. After reviewing the prosecutor's explanation, and considering the record further for signs of covert group bias, the majority held that "the exercise of these peremptory challenges, although having to do with religion in a general sense, does not offend the constitutional prohibition against discrimination based on religious principles or creed." *Ibid.*

Judge Fuentes, in dissent, criticized the majority for its narrow construction of the holding in *Gilmore,* "[t]hat is, in order for a peremptory challenge to run afoul of the constitutional proscription against discrimination based on the exercise of religious principles, it must specifically target a juror because he or she is Catholic, or Jewish, or Protestant, or of the Muslim faith." *Id.* at 297, 812 *A.*2d 389. Such a view improperly limits "an individual's religious beliefs to ... group membership, without the concomitant fundamental right to publicly follow the teachings of one's faith, whether in the form of religious attire or through the pursuit of a missionary calling." *Ibid.* The dissent found that

> [u]nlike race, gender, ethnicity or national origin, where the individual's protected status is derived from being part of a group with readily apparent and "immutable characteristics," the protection afforded to "religious principles" under Paragraph 5 [of the New Jersey Constitution] must include both denominational affiliation and the right to freely and openly express the precepts of one's faith. To protect the former but leave the latter exposed to invidious assaults would render meaningless the constitutional guarantee of religious freedom.
>
> [*Id.* at 297–98, 812 *A*.2d 389.]

The dissent concluded: "The [New Jersey] Constitution protects all religious convictions, those of the devout as well as those of the agnostic, those which are kept private as well as those which are demonstratively held." *Id.* at 298, 812 *A*.2d 389.

The dissent also found that the State's use of peremptory challenges to remove overtly religious jurors violated the Equal Protection Clause of the United States Constitution under *J.E.B. v. Alabama,* 511 *U.S.* 127, 114 *S.Ct.* 1419, 128 *L.Ed.*2d 89 (1994) and *Batson v. Kentucky,* 476 *U.S.* 79, 106 *S.Ct.* 1712, 90 *L.Ed.*2d 69 (1986). *Fuller, supra,* 356 *N.J.Super.* at 292, 812 *A*.2d 389. In those cases, the Supreme Court held that the guarantee of equal protection forbids, as a proxy for juror bias, the use of race, *Batson, supra,* 476 *U.S.* at 97–98, 106 *S.Ct.* at 1723–24, 90 *L.Ed.*2d at 88, or gender, *J.E.B., supra,* 511 *U.S.* at 143, 114 *S.Ct.* at 1429, 128 *L.Ed.*2d at 106. The dissent reasoned that "a strict scrutiny analysis" is triggered by the dismissal of potential jurors based on their religious beliefs. *Fuller, supra,* 356 *N.J.Super.* at 293, 812 *A*.2d 389 (citing *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 *U.S.* 520, 546, 113 *S.Ct.* 2217, 2233, 124 *L.Ed.*2d 472, 498 (1993)); *Larson v. Valente,* 456 *U.S.* 228, 246, 102 *S.Ct.* 1673, 1684, 72 *L.Ed.*2d 33, 49 (1982)). In Judge Fuentes' view, therefore, the State must demonstrate that its action "is narrowly tailored to further its legitimate interest in achieving a fair and impartial trial." *Ibid.* (citing *J.E.B., supra,* 511 *U.S.* at 137, 114 *S.Ct.* at 1426, 128 *L.Ed.*2d at 102)). The State, in this case, knew nothing about the individual convictions of the jurors it challenged for their ostensible religious devotion; rather, it targeted M.S. and C.E. for exclusion "based only on stereotypic notions of group bias." *Id.* at 294, 812 *A*.2d 389. That, the dissent found, simply

did not "provide a narrowly tailored, constitutionally-acceptable rationale for exclusion," but demonstrated the very type of "hostility towards religious expression" that the Equal Protection Clause was meant to prohibit. *Ibid.*

The dissent considered the State's use of peremptory challenges under the Free Exercise Clause of the First Amendment of the Federal Constitution even though the issue had not been raised either in the trial court or before the Appellate Division. *Id.* at 295, 812 *A.2d* 389. Judge Fuentes compared the prosecutor's rejection of demonstrably religious jurors to a statute invalidated by the United States Supreme Court because it prohibited clergymen from serving as delegates to a state's constitutional convention. *Id.* at 295–96, 812 *A.2d* 389 (citing *McDaniel v. Paty*, 435 *U.S.* 618, 631–32, 98 *S.Ct.* 1322, 1330–31, 55 *L.Ed.2d* 593, 603–04 (1978)). Justice Brennan, concurring in *McDaniel*, had explained:

> The [statute] imposes a unique disability upon those who exhibit a defined level of intensity of involvement in protected religious activity. Such a classification as much imposes a test for office based on religious conviction as one based on denominational preference. A law which limits political participation to those who eschew prayer, public worship, or the ministry as much establishes a religious test as one which disqualifies Catholics, or Jews, or Protestants.
>
> [*Id.* at 295, 812 *A.2d* 389 (quoting *McDaniel, supra,* 435 *U.S.* at 632, 98 *S.Ct.* at 1331, 55 *L.Ed.2d* at 604).]

The dissent reasoned that striking potential jurors because they are demonstrably religious "amounts to an unconstitutional imposition of a 'special disability' on the basis of religious views or status," and concluded that "a citizen's right to participate in jury service [cannot be conditioned on] the suppression of constitutionally protected religious expression." *Id.* at 296, 812 *A.2d* 389 (citations omitted).

Defendant appealed as of right under *Rule* 2:2–1(a)(2).[2] The American Civil Liberties Union of New Jersey and the Rutherford Institute were granted *amicus curiae* status.

---

[2] Because we denied defendant's Petition for Certification, *State v. Fuller*, 176 *N.J.* 426, 824 *A.2d* 156 (2003), only the issues considered by the dissent are

## II.

For well more than a century the United States Supreme Court has recognized that jury selection is subject to the guarantees of the Equal Protection Clause of the Federal Constitution. In 1880, the Court struck down a state law prohibiting African Americans from serving on a grand or petit jury in the State of West Virginia. *Strauder v. West Virginia*, 100 *U.S.* 303, 25 *L.Ed.* 664 (1879). The Court found in *Strauder* that to deny African Americans the

> right to participate in the administration of the law, as jurors, [for no other reason than race,] is practically a brand upon them, affixed by the law, an assertion of their inferiority, and a stimulant to that race prejudice which is an impediment to securing to individuals of the race that equal justice which the law aims to secure to all others.
>
> [*Id.* at 308, 25 *L.Ed.* at 666.]

*Strauder* established that it is a denial of equal protection for a defendant to be tried before a jury selected from a venire that, by law, excludes members of his or her race "because of color alone, however well qualified [they are] in other respects." *Id.* at 309, 25 *L.Ed.* at 666.

In *Swain v. Alabama*, 380 *U.S.* 202, 85 *S.Ct.* 824, 13 *L.Ed.*2d 759 (1965), *overruled by Batson, supra*, 476 *U.S.* 79, 106 *S.Ct.* 1712, 90 *L.Ed.*2d 69, the Supreme Court extended the constitutional principle announced in *Strauder* to the state prosecutor's use of peremptory challenges. In deference, however, to the "very old credentials" of peremptory challenges and their valued function in our jury system,[3] the Court required defendants to prove system-

---

before the Court. We need not, and do not, reach the dissent's Free Exercise determination.

[3] Justice O'Connor later characterized peremptory challenges as both a tool of lawyer discretion driven by intuitions that can be difficult to articulate and a means of selecting qualified and unbiased juries. *J.E.B.*, 511 *U.S.* at 147–48, 114 *S.Ct.* at 1431, 128 *L.Ed.*2d at 108–09 (O'Connor, J., concurring); *see also Holland v. Illinois*, 493 *U.S.* 474, 484, 110 *S.Ct.* 803, 809, 107 *L.Ed.*2d 905, 919 (1990) ("Peremptory challenges, by enabling each side to exclude those jurors it believes will be most partial towards the other side, are a means of eliminating

atic discrimination preventing African Americans from serving on petit juries. *Id.* at 212–24, 85 *S.Ct.* at 831–38, 13 *L.Ed.*2d at 768–74. *Swain* saddled defendants with a "crippling burden of proof" and, in turn, rendered peremptory challenges "largely immune from constitutional scrutiny" until the Court revisited the issue twenty-one years later. *Batson, supra,* 476 *U.S.* at 92–93, 106 *S.Ct.* at 1721, 90 *L.Ed.*2d at 85. In *Batson,* the Court scrapped the *Swain* requirements and held that "a defendant may establish a *prima facie* case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Id.* at 96, 106 *S.Ct.* at 1723, 90 *L.Ed.*2d at 87. Under *Batson,* "[o]nce the defendant makes a *prima facie* showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Id.* at 97, 106 *S.Ct.* at 1723, 90 *L.Ed.*2d at 88.

In the years following, the Supreme Court expanded the sweep of *Batson. See Powers v. Ohio,* 499 *U.S.* 400, 415, 111 *S.Ct.* 1364, 1373, 113 *L.Ed.*2d 411, 428 (1991) ("[A] defendant in a criminal case can raise the third-party equal protection claims of jurors excluded by the prosecution because of their race."); *Hernandez v. New York,* 500 *U.S.* 352, 371–72, 111 *S.Ct.* 1859, 1872–73, 114 *L.Ed.*2d 395, 413–14 (1991) (suggesting, in *dicta,* that strikes based on ethnicity are prohibited); *Edmonson v. Leesville Concrete Co.,* 500 *U.S.* 614, 630, 111 *S.Ct.* 2077, 2088, 114 *L.Ed.*2d 660, 680 (1991) (prohibiting race-based strikes by civil litigants); *Georgia v. McCollum,* 505 *U.S.* 42, 59, 112 *S.Ct.* 2348, 2359, 120 *L.Ed.*2d 33, 51 (1992) (prohibiting race-based strikes by criminal defendants). Nonetheless, *Batson* remained confined by the perception that it was a "special rule of relevance" not applicable "[o]utside the uniquely sensitive area of race." *Brown v. North Carolina,* 479

---

extremes of partiality on both sides, thereby assuring the selection of a qualified and unbiased jury.") (internal quotation marks and citations omitted); *Batson,* 476 *U.S.* at 91, 106 *S.Ct.* at 1720, 90 *L.Ed.*2d at 84 ("[Peremptory] challenges traditionally have been viewed as one means of assuring the selection of a qualified and unbiased jury.").

*U.S.* 940, 942, 107 *S.Ct.* 423, 424, 93 *L.Ed.*2d 373, 374 (1986) (O'Connor, J., concurring in denial of *certiorari* ); *see also J.E.B.*, *supra,* 511 *U.S.* at 155, 114 *S.Ct.* at 1435, 128 *L.Ed.*2d at 113 ("[A]ll of our post-*Batson* cases ... have described *Batson* as fashioning a rule aimed at preventing purposeful discrimination against a cognizable racial group.") (Rehnquist, J., dissenting). As a result, when the Court held in *J.E.B.* that "gender, like race, is an unconstitutional proxy for juror competence and impartiality," the legal landscape shifted. *Id.* at 129, 114 *S.Ct.* at 1421, 128 *L.Ed.*2d at 97. In applying heightened scrutiny to the question of gender-based peremptory challenges, *id.* at 135, 114 *S.Ct.* at 1424, 128 *L.Ed.*2d at 101, *J.E.B.* suggested that the *Batson* rationale, no longer limited to race, should extend to other suspect classifications.

In *J.E.B.*, the Court found race-based discrimination and gender-based discrimination to be rooted in a common theme—the systematic exclusion of both racial minorities and women from participation in the civic life of our country. *Id.* at 135–36, 114 *S.Ct.* at 1425, 128 *L.Ed.*2d at 101–02. A tradition of denying both groups the opportunity to serve on a jury was but one manifestation of the deprivation suffered by minorities and women through state action. *Id.* at 136, 114 *S.Ct.* at 1425, 128 *L.Ed.*2d at 101; *see Powers, supra,* 499 *U.S.* at 407, 111 *S.Ct.* at 1369, 113 *L.Ed.*2d at 423 ("[W]ith the exception of voting, for most citizens the honor and privilege of jury duty is the most significant opportunity to participate in the democratic process."). That " 'long and unfortunate history' " had provided the contextual underpinning for the heightened scrutiny applied to gender-based classifications. *J.E.B., supra,* 511 *U.S.* at 136, 114 *S.Ct.* at 1425, 128 *L.Ed.*2d at 101 (quoting *Frontiero v. Richardson,* 411 *U.S.* 677, 684, 93 *S.Ct.* 1764, 1769, 36 *L.Ed.*2d 583, 590 (1973)). Under the heightened scrutiny standard, the Court framed the question raised by *J.E.B.* as "whether peremptory challenges based on gender stereotypes provide substantial aid to a litigant's effort to secure a fair and impartial jury." *Id.* at 137, 114 *S.Ct.* at 1426, 128 *L.Ed.*2d at 102.

To frame the question was to answer it in the negative. *J.E.B.* involved a paternity action in which the State of Alabama used gender-based challenges in furtherance of a perception that men would favor the alleged father, and women would favor the mother. *Id.* at 137–38, 114 *S.Ct.* at 1426, 128 *L.Ed.*2d at 102. The Court declined to "accept as a defense . . . the very stereotype the law condemns." *Id.* at 139, 114 *S.Ct.* at 1426, 128 *L.Ed.*2d at 102–03 (internal quotations and citation omitted). Such discriminatory stereotypes were found "harm[ful] to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process." *Id.* at 140, 114 *S.Ct.* at 1427, 128 *L.Ed.*2d at 104.

*J.E.B.* does not suggest an answer to the question posed in this case even assuming that defendant's objection to the prosecutor's peremptory challenges is based on the juror's affiliation with a particular religion. If, as one commentator has suggested, *J.E.B.* and *Batson* are remedial, offering "special responses to special needs," J. Suzanne Bell Chambers, Note, *Applying the Break: Religion and the Peremptory Challenge*, 70 *Ind. L.J.* 569, 598 (1995), then the holdings in those cases may not extend to religion-based challenges. Yet, the Court applies strict scrutiny to classifications based on religion, *Larson, supra,* 456 *U.S.* at 246, 102 *S.Ct.* at 1684, 72 *L.Ed.*2d at 49, and concern about state sanctioned religious discrimination has deep historical roots. Indeed, the impetus for the Free Exercise and Establishment Clauses of the First Amendment came from a recognition by the founding fathers that different religions should not be treated differently by the State. *See id.* at 244–46, 102 *S.Ct.* at 1683–85, 72 *L.Ed.*2d at 47–49. At this juncture, it simply is not clear whether the federal equal protection analysis of *Batson* and *J.E.B.* compel a similar result when a peremptory challenge is based on religion.

Less than a year before *J.E.B.* was handed down, the Supreme Court of Minnesota considered "whether the peremptory strike has been purposefully employed to perpetrate religious bigotry to the extent that the institutional integrity of the jury has been

impaired, ... requiring further modification of the traditional peremptory challenge." *State v. Davis,* 504 *N.W.*2d 767, 770 (Minn.1993), *cert. denied,* 511 *U.S.* 1115, 114 *S.Ct.* 2120, 128 *L.Ed.*2d 679 (1994). In *Davis,* when the prosecutor used one of her three peremptory challenges to strike an African–American juror, the defense asked for a "race-neutral explanation." *Id.* at 768. The prosecutor responded:

> [I]t was highly significant to the State ... that the man was a Jahovah [sic] Witness. I have a great deal of familiarity with the sect of Jahovah's Witness. I would never, if I had a preemptory [sic] challenge left ... fail to strike a Jahovah Witness from my jury.

> . . . .

> In my experience Jahovah [sic] Witness are reluctant to exercise authority over their fellow human beings in this Court House.

> [*Ibid.*]

The Supreme Court of Minnesota distinguished religion-based peremptory challenges from the race-based challenges rejected in *Batson.* In *Batson,* Justice Marshall had commented that "[m]isuse of the peremptory challenge to exclude black jurors has become both common and flagrant." 476 *U.S.* at 103, 106 *S.Ct.* at 1726, 90 *L.Ed.*2d at 92 (Marshall, J., concurring). The *Davis* court found that challenges based on religion were neither "common and flagrant," nor as "historically ingrained in the jury selection process as is race...." *Davis, supra,* 504 *N.W.*2d at 771. The difficulty in distinguishing religious bias from "moral values" or "societal views" suggested to the court that there would be difficulty in distinguishing between impermissible discrimination against religious beliefs and valid uses of peremptory challenges. *Ibid.* Also, the court explained, "religious affiliation (or lack thereof) is not as self-evident as race or gender. Consequently, for every peremptory strike, opposing counsel could demand a religion-neutral explanation." *Ibid.* That possibility would "unduly complicate *voir dire* " and erode the usefulness of the peremptory

challenge process.[4] *Ibid.* For those reasons, the *Davis* court refused "to extend *Batson* to religious affiliation." *Ibid.* Instead, the court sought to avoid future peremptory challenge claims relating to religious affiliation by prohibiting questions during *voir dire* that would elicit information about a juror's religion. *Id.* at 772.

*Davis* viewed *Batson* as limited to the context of race. *Id.* at 771–72. Of course *J.E.B.,* decided after *Davis,* took a more expansive view. Yet, the United States Supreme Court denied *certiorari* in *Davis,* 511 *U.S.* 1115, 114 *S.Ct.* 2120, 128 *L.Ed.*2d 679 (1994). It is of some interest that Justice Thomas, dissenting from that denial (joined by Justice Scalia), suggested:

> In breaking the barrier between classifications that merit strict equal protection scrutiny and those that receive what we have termed heightened or intermediate scrutiny, *J.E.B.* would seem to have extended *Batson's* equal protection analysis to all strikes based on the latter category of classifications—a category which presumably would include classifications based on religion.
>
> [*Id.* at 1115, 114 *S.Ct.* at 2122, 128 *L.Ed.*2d at 680.]

Justice Ginsburg, however, pointed out "that the dissent's portrayal of the opinion of the Minnesota Supreme Court is incomplete." *Ibid.* She reminded her colleagues that *Davis* relied in part on the "self-evident" nature of race and gender (as opposed to "religious affiliation"), and on the general rule that *voir dire* in respect of religion "is irrelevant and prejudicial." *Ibid.* (citations omitted).

Since *J.E.B.,* a number of state and federal courts have reviewed peremptory challenges based on religion and/or religious activities. *See, e.g., United States v. Brown,* 352 *F.*3d 654, 669 (2d Cir.2003) (stating that after *Batson* and *J.E.B.* potential jurors cannot be excused solely because of religious affiliation, but, also, that "[d]ifferentiating among prospective jurors on the basis of their [religious] activities does not plainly implicate the same unconstitutional proxies"); *United States v. DeJesus,* 347 *F.*3d

---

[4] It is unclear how the juror's religious affiliation came to light in *Davis.* One of the dissenting justices implied that it came up during *voir dire. Davis, supra,* 504 *N.W.*2d at 774 (Wahl, J., dissenting).

500, 510 (3d Cir.2003) (finding "no need [to] reach the question of whether peremptory strike based solely on religious affiliation would be unconstitutional" because strikes at issue were properly based on religious activities); *United States v. Stafford,* 136 *F.*3d 1109, 1114 (7th Cir.1998) (suggesting but not deciding that peremptory challenges based on religious affiliation "would be improper and perhaps unconstitutional," whereas strikes based on belief related to case and perhaps even based on religious tenets would be permissible); *State v. Hodge,* 248 *Conn.* 207, 726 *A.*2d 531, 553, *cert. denied,* 528 *U.S.* 969, 120 *S.Ct.* 409, 145 *L.Ed.*2d 319 (1999) ("[O]ne's religious *affiliation,* like one's race or gender, bears no relation to that person's ability to serve as a juror."); *Casarez v. State,* 913 *S.W.*2d 468, 495 (Tex.Crim.App.1995) (holding that challenges based on religious affiliation are justified as "promot[ing] fairness and impartiality on the jury"). *See generally,* Caroline R. Krivacka & Paul D. Krivacka, Annotation, *Use of Peremptory Challenges to Exclude Persons from Criminal Jury Based on Religious Affiliation—Post–Batson State Cases,* 63 *A.L.R.* 5th 375 (1998). That case law is instructive.

We discern, in the absence of a definitive ruling from the United States Supreme Court, an emerging consensus to extend the equal protection analysis of *Batson* and *J.E.B.* to peremptory challenges based solely on religious affiliation and to find those challenges unconstitutional.[5] Challenges based on religious beliefs or religious activities, however, are generally permitted. In respect of those challenges, the courts reason that the origin of a belief, religious, political or social, is irrelevant to the question whether the juror holding that belief will be able to carry out his or her duties in relation to the case at bar impartially and as instructed by the court.

---

[5] The Court of Criminal Appeals of Texas is a notable exception to that trend. After rehearing *en banc,* the Texas court found that *J.E.B.* was not dispositive of the issue, and that even under a heightened scrutiny equal protection analysis, religion-based peremptory challenges are permissible because "it is not unjust to attribute beliefs characteristic of [a particular] faith" to all of the members of that faith. *Casarez, supra,* 913 *S.W.*2d at 492.

## III.

New Jersey has chosen a different path.

A year before the United States Supreme Court's decision in *Batson*, our Appellate Division held that the New Jersey Constitution "guarantee[s] that a defendant in a criminal case is entitled to a jury trial by a fair and impartial jury without discrimination on the basis of race, color, ancestry or national origin." *State v. Gilmore*, 199 *N.J.Super.* 389, 398, 489 *A.2d* 1175 (App.Div.1985) (*Gilmore I*). The case involved an African–American defendant indicted for three separate first-degree robberies of two Hispanic gas station attendants. *Id.* at 395, 489 *A.2d* 1175. Of the nine African–American jurors available, two were excused for cause and the other seven were excused by the prosecutor through peremptory challenges, with the result that an all-white jury was empanelled. *Ibid.* When asked to explain his use of peremptories, the prosecutor responded: "It's my understanding of the rules that I can exercise my peremptory challenges as I see fit." *Ibid.* The trial court, without further inquiry, denied defendant's motion for a mistrial and the jury convicted him. *Id.* at 395–96, 489 *A.2d* 1175.

The Appellate Division remanded the case for the prosecutor to present reasons for striking the seven African–American jurors. *State v. Gilmore*, 195 *N.J.Super.* 163, 478 *A.2d* 783 (App.Div.1984). On remand, the prosecutor pointed out that the defendant was the son of a Baptist minister and expressed a concern that Baptist jurors (the prosecutor assumed that the African–American venirepersons "were predominantly Baptists") would be influenced by the "anticipated [testimony of] defendant's parents and other Baptist ministers [who] would be alibi and/or character witnesses." *Gilmore I, supra,* 199 *N.J.Super.* at 410, 489 *A.2d* 1175. The prosecutor also explained that he wanted "a jury that would not be swayed by emotions," and therefore, "jurors who were (1) able to ignore theatrics, (2) more intelligent and of the professional type, and (3) . . . without maternal family instincts." *Ibid.* Based on those criteria, all of the African–American men and women were

excused, although white jurors who similarly fell within the prosecutor's prohibited categories were not similarly excluded. *Id.* at 412, 489 *A.*2d 1175. When the case returned to the Appellate Division after the remand proceeding, Justice Coleman, then Judge Coleman,[6] found that the prosecutor's "explanations were 'sham excuses belatedly contrived to avoid admitting acts of group discrimination against all the black prospective jurors.' " *Id.* at 412–13, 489 *A.*2d 1175 (quoting *People v. Wheeler,* 22 *Cal.*3d 258, 148 *Cal.Rptr.* 890, 583 *P.*2d 748, 765 (1978)). The panel concluded that "the State [had] used its peremptory challenges to engage in invidious racial discrimination in violation of *N.J. Const.* (1947), ¶ 5, ¶ 9[,] and ¶ 10." *Id.* at 413, 489 *A.*2d 1175.

By the time we issued our decision in *Gilmore, Batson* had rejected the heavy burden of proof prescribed by *Swain* and had applied federal equal protection principles to peremptory challenges based on race. We observed in *Gilmore* that *Batson's* interpretation of the Equal Protection Clause provided sufficient grounds to affirm the holding of the Appellate Division under the Federal Constitution. *Gilmore, supra,* 103 *N.J.* at 522, 511 *A.*2d 1150. In the interim before *Batson,* however, other state courts considering race-based peremptory challenges had turned to their own "state constitutions as sources of fundamental rights surpassing those guaranteed by the [F]ederal [C]onstitution." *Id.* at 520, 511 *A.*2d 1150. Indeed, the Appellate Division had relied on our Constitution for its holding, following the approach of the Supreme Court of California in *People v. Wheeler, supra,* 148 *Cal.Rptr.* 890, 583 *P.*2d at 758, wherein that court had based its holding on the California Constitution. *Gilmore I, supra,* 199 *N.J.Super.* at 401–02, 489 *A.*2d 1175. When *Gilmore* I reached our Court we, also, chose our State Constitution "as providing greater protection to our citizens' individual rights than accorded them under the [F]ederal [C]onstitution." *Gilmore, supra,* 103 *N.J.* at 523, 511 *A.*2d 1150 (citation omitted). We now highlight those differences

---

[6] Justice Coleman served as a member of this Court from 1994 to 2003.

and lay the foundation for our decision in this case. As in *Gilmore*, we use "federal [and] other state court opinions ... for the purpose of guidance, not as compelling the result we reach on independent state grounds." *Id.* at 524, 511 *A.*2d 1150.

For this Court, defining the permissible bounds for the exercise of peremptory challenges by a prosecutor implicates "the defendant's constitutional right to trial by an impartial jury under various provisions of Article I of the New Jersey Constitution." *Ibid.* As a unitary guarantee of that right, we turned in *Gilmore* to Article I, paragraph 5 ("No person shall be denied the enjoyment of any civil ... right, nor be discriminated against in the exercise of any civil ... right, ... because of religious principles, race, color, ancestry or national origin."), paragraph 9 ("The right of trial by jury shall remain inviolate ...."), and paragraph 10 ("In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury...."). We drew from those provisions a core principle that in our heterogeneous society the right to an impartial petit jury encompasses the right to a "jury drawn from a representative cross-section of the community." *Gilmore, supra*, 103 *N.J.* at 524, 511 *A.*2d 1150; *cf. State v. Rochester*, 54 *N.J.* 85, 88, 92, 253 *A.*2d 474 (1969) (stating that right to trial by impartial jury under New Jersey Constitution requires grand jury venire to be drawn from representative cross-section of community); *see also State v. Stewart*, 2 *N.J.Super.* 15, 24, 64 *A.*2d 372 (App.Div.1949) (establishing foundation for representative cross-section rule in New Jersey).[7]

---

[7] Indeed, at the time we understood both the United States Constitution and the New Jersey Constitution to extend to the petit jury the "right to an impartial jury venire drawn from a representative cross-section of the community." *Gilmore, supra*, 103 *N.J.* at 527, 511 *A.*2d 1150 (emphasis omitted). *Cf. Taylor v. Louisiana, supra*, 419 *U.S.* 522, 95 *S.Ct.* 692, 42 *L.Ed.*2d 690 (1975) (holding that systematic exclusion of women from jury venire violates fair-cross-section requirement); *Duren v. Missouri*, 439 *U.S.* 357, 99 *S.Ct.* 664, 58 *L.Ed.*2d 579 (1979) (same). Three-and-a-half years after *Gilmore*, however, in *Holland, supra*, the Supreme Court held in a five-to-four decision that the Sixth Amendment applies only to the venire and does not limit "a prosecutor's use of peremptory

The representative cross-section rule is based on certain social realities that, in our view, apply both to the initial selection of the venire and to the selection of the petit jury from the venire. We recognize

> that ... jurors will inevitably belong to diverse and often overlapping groups defined by race, religion, ethnic or national origin, sex, age, education, occupation, economic condition, place of residence, and political affiliation; that it is unrealistic to expect jurors to be devoid of opinions, preconceptions, or even deep-rooted biases derived from their life experiences in such groups; and hence that *the only practical way to achieve an overall impartiality is to encourage the representation of a variety of such groups on the jury so that the respective biases of their members, to the extent they are antagonistic, will tend to cancel each other out.* [*Gilmore, supra,* 103 *N.J.* at 525, 511 *A.2d* 1150 (quoting *Wheeler, supra,* 148 *Cal.Rptr.* 890, 583 *P.2d* at 755) (emphasis added).]

The rule does "not ... guarantee proportional representation of every diverse group on every jury" (a practical impossibility in any case), but rather, makes possible a diversity of perspectives that fosters an "overall impartiality of the deliberative process." *Ibid.* To achieve that goal, "[t]he methods of [juror] selection must be so designed as to insure that juries are impartially drawn from community cross-sections," *id.* at 526, 511 *A.2d* 1150 (citations omitted), and that peremptory challenges are not used to "discriminat[e] against ... discrete, cognizable groups." *Ibid.* Indeed, in *Gilmore* we were quite clear as to the "floor" for that protection:

> Article I, paragraphs 5 and 1 define the core cognizable groups for purposes of impartial jury analysis under the representative cross-section rule, but are not necessarily definitive of those groups. That is, at a minimum, cognizable groups include those defined on the basis of *religious principles, race, color, ancestry, national origin, and sex* (all of which are suspect or semi-suspect classifications triggering strict or intermediate scrutiny under federal equal protection analysis).

---

challenges to eliminate a distinctive group in the community ..." from the petit jury. 493 *U.S.* at 478, 110 *S.Ct.* at 806, 107 *L.Ed.*2d at 915. Although bound by the Supreme Court's interpretation of the Federal Constitution, we continue to follow our prior determination in *Gilmore* that, under New Jersey's analogue to the Sixth Amendment, peremptory challenges are subject to an examination essentially akin to the equal protection analysis of *Batson*. In so doing, we adopt Justice Marshall's view that "no rational distinction can be drawn ... between the claims we [previously have] accepted [as to the selection of the venire and] the claim at issue here." *Id.* at 497, 110 *S.Ct.* at 816, 107 *L.Ed.*2d at 927 (Marshall, J., dissenting).

[*Id.* at 526–27 n. 3, 511 *A.*2d 1150 (citations omitted) (emphasis added).]

Unlike *Batson*, which is limited in application to race, or *J.E.B.*, which is limited in application to gender, *Gilmore* explicitly includes "religious principles" among the group classifications that must be protected if the representative cross-section rule is to have meaning.

But *Gilmore* also recognized the traditional role of both challenges for cause and peremptory challenges in securing an impartial jury. We observed that "[p]eremptory challenges, when properly used, are intended to insure that the triers of fact will be as nearly impartial as the lot of humanity will admit." *Id.* at 530, 511 *A.*2d 1150 (citations and internal quotations omitted). In that sense, we found that

> the purposes of the representative-cross-section rule and the peremptory challenge are congruent. Neither should be allowed to undermine the other; both must be delimited to further their common end. The peremptory challenge, exercised in an absolute unfettered manner, could be abused to strike all members of certain cognizable groups from the jury venire, and so could destroy the representative-cross-section rule. On the other hand, the representative-cross-section rule, applied unflinchingly, exalts demographic representativeness above the overall impartiality it aims to further. . . .
>
> [*Ibid.*]

*Gilmore* resolved any tension between the dictates of the representative cross-section rule and the use of peremptory challenges by distinguishing challenges based on "impermissible presumed group bias" from challenges based on "valid, articulated, trial-related reasons." *Id.* at 531, 511 *A.*2d 1150. The Court "adapt[ed] ... the burden-of-proof rules fashioned in 'disparate treatment' cases brought under Title VII of the Civil Rights Act of 1964, 42 *U.S.C.A.* §§ 2000e to 2000e–17," *id.* at 533, 511 *A.*2d 1150, to test a defendant's claim that the prosecution used peremptory challenges improperly:

> We begin with the rebuttable presumption that the prosecution has exercised its peremptory challenges on grounds permissible under Article I, paragraphs 5, 9, and 10 of the New Jersey Constitution. . . .
>
> [To rebut that presumption], the defendant initially must establish that the potential jurors wholly or disproportionally excluded were members of a cognizable group within the meaning of the representative cross-section rule. The defendant

then must show that there is a substantial likelihood that the peremptory challenges resulting in the exclusion were based on assumptions about group bias rather than any indication of situation-specific bias. . . .

. . . . [Once that showing has been made, t]he burden shifts to the prosecution to come forward with evidence that the peremptory challenges under review are justifiable on the basis of concerns about situation-specific bias. To carry this burden, the State must articulate "clear and reasonably specific" explanations of its "legitimate reasons" for exercising each of the peremptory challenges. The trial court must decide whether these are, on the one hand, genuine and reasonable grounds for believing that potential jurors might have situation-specific biases that would make excusing them reasonable and desirable, given the aim of impaneling a fair and impartial petit jury, or, on the other hand, "sham excuses belatedly contrived to avoid admitting acts of group discrimination."

[*Id.* at 535–38, 511 *A.*2d 1150 (citations omitted); *see State v. Watkins,* 114 *N.J.* 259, 264–65, 553 *A.*2d 1344 (1989) (reaffirming and applying burden of proof rule set forth in *Gilmore* ).]

## IV.

In New Jersey, peremptory challenges may not be used to remove potential jurors who belong to a "cognizable group[ ] . . . defined on the basis of religious principles. . . ." *Id.* at 527 n. 3, 511 *A.*2d 1150. The question posed before us, more precisely framed, is whether potential jurors who wear religious garb, or engage in religious activities, fall within the protected group. Although *Gilmore* does not answer that specific question, it provides both the applicable legal principles and the framework for analysis. We begin, then, with the facts as presented in the record before the trial court, to which we apply the precepts of *Gilmore.*

The pretrial transcript and the transcript on the defendant's motion for a new trial inform us that two jurors were excused by the prosecutor because one "was a minister . . . or was a missionary" and the other "was, apparently, Muslim, . . . based upon his dress and the name." The prosecutor further asserted that he "did not dismiss any juror because of religious beliefs." His explanation for the two strikes was that he took both the Muslim "garb" ("a skull cap or a rather long outer garment") and the "missionary" activity as signs of religious devotion, and "that people who tend to be demonstrative about their religions tend to

favor defendants . . . ." In his view, *Gilmore* did not apply to those strikes because he was not attempting to remove anyone "of a particular race [or] a particular religious group."

*Gilmore* discusses in some detail the criteria for deciding when a defendant alleging improper use of peremptory challenges has made out a *prima facie* case. *Id.* at 536, 511 *A.*2d 1150. Here, the prosecutor responded immediately to the defense claims, thereby accepting the burden to "articulate 'clear and reasonably specific' explanations of . . . 'legitimate reasons' for exercising each of the peremptory challenges." *Id.* at 537, 511 *A.*2d 1150 (citations omitted). Yet, an issue remains whether, under *Gilmore*'s requirements for a *prima facie* case, "the potential jurors . . . excluded were members of a cognizable group within the meaning of the representative cross-section rule." *Id.* at 535–36, 511 *A.*2d 1150.

Below, the Appellate Division majority determined that demonstrably religious persons are not members of a cognizable group, *Fuller, supra,* 356 *N.J.Super.* at 280, 812 *A.*2d 389, whereas Judge Fuentes, in dissent, found that view to be unduly restrictive. *Id.* at 297, 812 *A.*2d 389. Both the majority and the dissent agree, however, as do most other federal and state courts, that a group defined on the basis of religious principles generally includes persons who, together, are affiliated with a particular religion. *See Gilmore, supra,* 103 *N.J.* at 541, 511 *A.*2d 1150 ("[The prosecutor's] admission that he excluded Blacks because he assumed that they were predominantly Baptists is a clear indication of group bias, both racial and *religious.*") (emphasis added); *see also People v. Martin,* 64 *Cal.App.*4th 378, 75 *Cal.Rptr.*2d 147, 148–49 (1998) (accepting classification of Jehovah's Witnesses as cognizable group); *Joseph, supra,* 636 *So.*2d at 779–80 (Fla.Dist.Ct.App. 1994) (Judaism); *Thorson v. State,* 721 *So.*2d 590, 594–95 (Miss. 1998) (Holiness Faith); *State v. Eason,* 336 *N.C.* 730, 445 *S.E.*2d 917, 920–23 (1994), *cert. denied sub nom. Eason v. North Carolina,* 513 *U.S.* 1096, 115 *S.Ct.* 764, 130 *L.Ed.*2d 661 (1995) (Jehovah's Witnesses); *People v. Langston,* 167 *Misc.*2d 400, 641

*N.Y.S.*2d 513, 513 (Sup.Ct.1996) (Islam). In this case, however, the prosecutor explained that his concern was with potential jurors "who strongly profess to religious belief" and not with the particular religions in which that belief was rooted. *Cf. DeJesus, supra,* 347 *F.*3d at 510 ("Even assuming that the exercise of a peremptory strike on the basis of religious affiliation is unconstitutional, the exercise of a strike based on religious beliefs is not."); *Stafford, supra,* 136 *F.*3d at 1114 ("It is necessary to distinguish among religious affiliation, a religion's general tenets, and a specific religious belief.").

One problem with distinguishing between ostensible belief and religious affiliation is that some affiliations are more apparent than others, not because of individual "strong" beliefs of the members, but, rather, as a function of religious tenets and requirements. In this case, the prosecutor assumed that M.S. was a devout Muslim after considering only his name and his dress (he was apparently wearing the "head-to-toe" black garment and prayer cap worn by Muslims, called a *thobe* or *jilbaab* and *kufi* ). Case law from other states indicates that prosecutors have used the same or similar criteria to identify Jews, *U.S. v. Sommerstein,* 959 *F.Supp.* 592, 594 (1997), and Muslims who are followers of Louis Farrakhan, *Card v. United States,* 776 *A.*2d 581, 588 (D.C.2001). As pointed out by *amicus curiae* American Civil Liberties Union of New Jersey, religious affiliation can be surmised from the garb and/or names of many persons, including Sikhs who wear turbans, Hasidic men who wear a *kapote* or *bekeake* (long black coat or caftan) and a *streimel* (black hat), and Amish men and women who wear plain dark colored clothes with no lapels or buttons. Yet, members of other religions, lacking characteristic names or outward expressions of their faith, appear immune from detection.

Justice Ginsburg observed when the Supreme Court denied *certiorari* in *Davis, supra,* that " 'religious affiliation is not as self-evident as race or gender,' " 511 *U.S.* at 1115, 114 *S.Ct.* at 2120, 128 *L.Ed.*2d at 679 (citation omitted); yet, any person whose religion requires or even encourages certain modes of dress is

understood to be affiliated with a specific religion and may be considered by the prosecutor to be demonstrably devout. Clothing, in those cases, is little more than a proxy for religion. It follows that by accepting the rationale of the prosecutor in this case, we " 'accept as a defense ... the very stereotype the law condemns.' " *J.E.B., supra,* 511 *U.S.* at 138, 114 *S.Ct.* at 1426, 128 *L.Ed.*2d at 102–03 (citation omitted). Indeed, what the prosecutor is suggesting is that Muslims who wear clothing associated with their faith, as a group, cannot sit as impartial jurors or follow the judge's instructions on the law. By excluding such persons based merely on religious bias rooted in stereotypes, neither the purpose of the peremptory challenge nor of the representative cross-section rule is served.

That the prosecutor also struck C.E., ostensibly because he was a missionary, does not change the result. Again, if we accept the prosecutor's stereotype (missionaries, because they are devout, are likely to sympathize with defendants), we accept also a disproportionate impact on those religious groups that encourage or require missionary work of their adherents, *e.g.,* Mormons. *See* Official Internet Site of Basic Beliefs of Church of Jesus Christ of Latter–Day Saints, *at* http://www.mormon.org/learn/0,8672,1022–1,00.html (documenting that over 60,000 Mormons volunteer for missionary service worldwide). Moreover, in this case, when describing what being a missionary meant to him, the prosecutor focused on the equivalence between "missionary" and "some sort of religious affiliation." [8] That association again suggests that as to C.E., his status was being used by the prosecutor as a proxy for religion.

We have adverted to the developing body of case law separating religious activities from religious affiliation, and accept-

---

[8] The prosecutor also said that C.E. was a minister. The record is not clear as to C.E.'s status; however, taken as a whole, it suggests that to the prosecutor, C.E.'s "religious affiliation" meant that he was devout and that, therefore, he would favor defendants.

ing peremptory challenges as to the former and not as to the latter. For purposes of establishing a *prima facie* case in this jurisdiction, the adherents of religions that encourage or require visible signs of identification or certain religion-based activities, will be deemed members of a cognizable group "within the meaning of the representative cross-section rule." *Gilmore, supra,* 103 *N.J.* at 535–36, 511 *A.*2d 1150. Because the jurors excluded in this case are members of a cognizable group under our ruling, and because the prosecutor accepted the burden to come forward, *see ante* at 180, 862 *A.*2d at 1133, we must examine his statements in order to determine whether he has presented sufficient evidence of situation-specific bias to justify the State's peremptory challenges.

We first observe that peremptory challenges are designed to " 'remove jurors who are believed to entertain specific bias [that is, "a bias relating to the particular case on trial or the parties or witnesses thereto,"] and no others.' " *Gilmore, supra,* 103 *N.J.* at 530–31, 511 *A.*2d 1150 (quoting *Wheeler, supra,* 148 *Cal.Rptr.* 890, 583 *P.*2d at 760–61) (citation omitted). Such challenges may serve this purpose whether or not they are used to strike members of a constitutionally protected cognizable group. Thus, in *Watkins, supra,* we said that "[a] lawyer need not accept an otherwise unacceptable juror merely because the juror is a member of a 'cognizable group.' " 114 *N.J.* at 267, 553 *A.*2d 1344. We have also pointed out that members of a cognizable group, like all potential jurors, may be excused for reasons not rising to the level of removal for cause. *Gilmore, supra,* 103 *N.J.* at 538, 511 *A.*2d 1150. And, most relevant here, prospective jurors' beliefs have been, and continue to be, proper grounds for removal when they demonstrate specific bias that inhibits those jurors from judging evidence and following instructions properly. *Ibid.; see, e.g., Hodge, supra,* 726 *A.*2d at 554 (finding reasonable basis for peremptory challenge based on venireperson's testimony that "in the event of a conflict between the court's instructions and his religious beliefs, he would seek guidance from his religious leader

about how to handle the situation"); *Eason, supra,* 445 *S.E.*2d at 921–23 (upholding challenge primarily rooted in juror's expressed reservations about death penalty and not her affiliation with Jehovah's Witnesses).

That said, the record in this case contains no evidence that the prosecutor's peremptory challenges in respect of either M.S. or C.E. were rooted in case specific bias indicating they would be disposed to favor the defense. Put simply, the prosecutor's "belief" that demonstrably religious persons are all alike in sharing defense-minded sympathies "sweep[s] so broadly as to attenuate [its] validity" by subverting " 'valid trial-related reasons' ... to approximate presumed group bias itself." *Gilmore, supra,* 103 *N.J.* at 543, 511 *A.*2d 1150. As we observed earlier, the prosecutor's belief suggests the very stereotypes that have been used to justify a policy of blanket exclusion that the law condemns. *J.E.B., supra,* 511 *U.S.* at 138, 114 *S.Ct.* at 1426, 128 *L.Ed.*2d at 102–03.

## V.

We have "chos[en] to limit the peremptory challenge to its proper purpose," *Gilmore, supra,* 103 *N.J.* at 530, 511 *A.*2d 1150, as another tool in the search for unbiased juries. To permit the use of such challenges to foster group bias would be to subvert that purpose. To turn a blind eye to the discriminatory impact of peremptory challenges exercised on religious grounds would leave trial courts unequipped to scrutinize prosecutors' explanations for pretext.[9] We leave in the hands of our capable trial judges the task of probing any proffered reasons for religion-based peremptory challenges, thereby ensuring review of those challenges that may be rooted in group bias.

---

[9] Although this case raises questions about a prosecutor's improper use of peremptory challenges, we do not distinguish between challenges used by the State from challenges used by defendants.

■■■ Prosecutors too must do their part. The State has argued that allowing a peremptory strike based on *indicia* of religious belief is preferable to "subject[ing] potential jurors to intrusive, and possibly offensive, questioning about their beliefs." *Hodge* offers a cautionary tale in this regard. After learning that that a potential juror was a practicing Muslim,[10] the prosecutor in *Hodge* "questioned [the juror] extensively about his religious beliefs," including some questions of "dubious relevance." *Hodge, supra,* 726 A.2d at 553, 554. We agree with the State that generally subjecting jurors to questions about their religious beliefs is intrusive and unnecessary, and adopt the approach in *Davis* as described by Justice Simonett:

> Ordinarily at common law, inquiry on voir dire into a juror's religious affiliation and beliefs is irrelevant and prejudicial, and to ask such questions is improper. Questions about religious beliefs are relevant only if pertinent to religious issues involved in the case, or if a religious organization is a party, or if the information is a necessary predicate for a voir dire challenge.... The trial court, in the exercise of its discretion, controls the questions that can be asked to keep the voir dire within relevant bounds. In this case, we do not know how the juror's religious affiliation came to light, but proper questioning for a challenge should be limited to asking jurors if they knew of any reason why they could not sit, if they would have any difficulty in following the law as given by the court, or if they would have any difficulty in sitting in judgment.
>
> [*Davis, supra,* 504 N.W.2d at 772 (citations omitted).]

■■■ We add the following. When, after proper questioning it becomes apparent that a juror has a specific bias based, perhaps, in religious belief, that prevents him or her from serving impartially, that bias may be examined, but only in relation to the requirements of jury participation. Probing but focused *voir dire* when the prosecutor reasonably suspects views incompatible with a juror's duties should elicit a basis for exclusion when a basis exists. In such a case, we expect the trial courts to manage *voir dire* in a manner that neither disadvantages the State from obtaining the information it needs, nor ignores the privacy inter-

---

[10] Prior to *voir dire*, the trial court told the juror, who had entered the courtroom wearing a hat, that he would have to remove the hat unless it was worn for religious reasons. The juror revealed his faith in response to this comment. *Hodge, supra,* 726 A.2d at 554 n. 45.

ests of potential jurors. Neutral questions unrelated to religious beliefs similar to those suggested by the Minnesota Supreme Court should suffice. Like many aspects of *voir dire,* the scope of that questioning is better left to the discretion of the trial courts. We emphasize that although prosecutors need not present reasons for disqualification rising to the level of a challenge for cause, they must not expect to rely on "hunches" to defeat a defendant's *prima facie* showing but, rather, on case specific information in respect of bias revealed on *voir dire.* *Gilmore, supra,* 103 *N.J.* at 538–39, 511 *A.*2d 1150.

## VI.

In *Gilmore,* we explained that an impartial jury "goes to the very essence of a fair trial." *Id.* at 543, 511 *A.*2d 1150 (quoting *State v. Williams,* 93 *N.J.* 39, 60, 459 *A.*2d 641 (1983)). Accordingly, the verdict of the jury cannot stand. *Ibid.*

The judgment of the Appellate Division is reversed and the matter is remanded to the Law Division for a new trial.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—6.

*Opposed*—None.